[Sac. No. 5537. In Bank. Dec. 28, 1944.]

Estate of IRENE L. TEEL, Deceased. JOHN E. TEEL, Appellant, v. RILMA K. GASKILL, Respondent.

Hill & Hill and Arthur W. Hill, Jr., for Appellant.

John F. Quinn and Irwin T. Quinn for Respondent.

CARTER, J.—This case involves the contest of the will of Irene L. Teel who died on December 2, 1940. Proponent is the surviving husband of decedent, and contestant is her daughter by a former marriage. The contest was based upon the grounds of undue influence and unsoundness of mind. A jury returned a verdict in favor of contestant on both grounds, and from a judgment entered thereon, proponent has appealed.

Proponent and decedent were married on June 29, 1940, the former being sixty-nine years and the latter sixty years of age. The will now under attack was executed on November 14, 1940, and decedent committed suicide on December 2, 1940.

Under the terms of the will in question, the testatrix stated that she purposely made no provision for contestant, her only daughter. All of her property was devised and bequeathed to proponent, and in case he should predecease her, to Roy Teel, her husband's son by a former marriage. It provided that her husband be appointed executor and if he should predecease her, that Roy Teel should serve as such. By a

reciprocal will executed at the same time, proponent devised all of his property to decedent, and in the event she predeceased him, to his son, Roy Teel. The latter was to serve as executor if decedent died first. Joint tenancy deeds to certain of their properties were also executed contemporaneously with the wills. The reciprocal wills and joint tenancy deeds were preceded by an antenuptial agreement in which each agreed to convey certain property to the other. Apparently that agreement was destroyed when the wills and deeds were executed.

Prior to her marriage to proponent decedent was married to Andrew J. Friend who died in 1936. Most of the property owned by decedent at the time of her marriage to proponent had been acquired from her former husband on his death, it being either community property or his separate property. Its value exceeded that of the property owned by proponent at that time.

Decedent's suicidal death apparently was accomplished by permitting an automobile motor to run in an enclosed place. Her dog died with her apparently from the same cause. She left a last note to her husband in which she stated that she was sorry they could not agree on money matters, but that nothing she could ever say would change his mind, and that she was sorry they "couldn't be happy together." She had just sent a birthday greeting card to a friend. There was no evidence of any unusual occurrence which motivated her suicidal act.

The sole contention on this appeal is that the evidence is insufficient to establish unsoundness of mind or undue influence. Inasmuch as we believe the evidence is sufficient to support the finding of undue influence, it will not be necessary to determine the sufficiency of the evidence as to mental incapacity. However, as the mental condition of the decedent is a factor to be considered on the issue of undue influence, the evidence on that subject will be discussed.

The record shows the following in regard to the mental condition of the decedent. The mutual wills were prepared by attorney H. L. Ricks of Eureka, who was consulted by proponent and decedent and the terms were discussed generally by them with the attorney. Mr. Ricks endeavored to persuade decedent that she should not disinherit her daughter but was unsuccessful. He testified that decedent was of sound mind when the will was executed.

Mrs. Hattie J. Hutchins, formerly Mrs. Colby, an acquaintance of decedent lived next door to her in Hydesville, Humboldt County, in 1938, at which time she deeded property to Mrs. Hutchins and husband and herself as joint tenants, and established a joint bank account of $2,500 to be used in the construction of a house on the property. Payments were made by the Colbys on the $2,500 at the rate of $15 per month. Apparently there was no consideration for the deeds. In 1939, when Mr. Colby died, decedent became unfriendly. When asked what decedent did, Mrs. Hutchins replied that she found four flat tires on her car, the glass in the tail-lights broken, solder poured into padlocks, and that she hacked walnut trees on the property so that they would die. The outcome of the property transaction was that Mrs. Hutchins reconveyed the joint tenancy property to decedent for about $500. From her observation of and dealings with decedent about fifteen months in 1938 and 1939, she considered her ''at times'' ''mentally unbalanced,'' that she was a ''very peculiar woman.'' She based her opinion on her actions, looks and deeds. She had a ''peculiar look'' at times. She testified: ''At one time she told me she planted a hedge across the back so a neighbor couldn't watch her or see her and then when she took another notion she trimmed it off so she could see, and I have known her to tell one neighbor that they could have the feed for their cows and turned right around in two or three days or so and let another neighbor put their's in, and things like that. We lived there all together fifteen months in the cabin and in the new house—— I did; it was fifteen months that I was there; just about a year that Mr. Colby and I were there.'' Decedent mentioned suicide to her about eight times giving no reason except that she felt ''ornery.'' She stated ''she thought she would go see a doctor and have the wheels taken out of her head.'' Decedent became confused over the deed of reconveyance from Mrs. Hutchins stating she had to obtain such a deed in order to protect a transaction she had made with another person after she had received the deed from Mrs. Hutchins.

Witness George Baham who knew decedent for about three and one-half years testified that she was ''most peculiar'' in relation to her property and ''things of that kind''; that ''she would do something and then wish she hadn't done it and things of that kind, confusion.''

The witness Gertrude Lewis testified that decedent bought

a nightgown three or four days before her death stating that she wanted "something nice" because she would use it only once.

Miss Estelle Gaskill, daughter of contestant, and granddaughter of decedent, testified that in July, 1940, decedent offered her money for admission to a rodeo. After Miss Gaskill returned home she received a post card from decedent to the effect that she had purchased a rodeo ticket for her and a handkerchief, although decedent had already given her the handkerchief.

The witness Roy Brown testified that in 1920 he rescued decedent when she attempted to commit suicide by drowning; that she had spoken of suicide on other occasions; that he had seen her in 1940; that she was not exactly insane but was "doggone badly off balance," had a "weak mind" in every respect, "friendship, business or anything else; she would only carry one friend at a time." He recited an incident which occurred about 1920 or 1922, when she purchased a worthless cow and heifer for $150 and $80 respectively.

The witness George A. Friend, a brother of decedent's first husband, having seen decedent frequently prior to 1936, and several times after that, stated that her mental condition was "rather bad" because she was friendly or unfriendly from time to time without reason; that she was a woman of "very peculiar ways," kept to herself and did not want to see people.

Contestant testified that from her observation of her mother for the last few years, and at or about the time of the execution of the will, her "mental condition was bad." Decedent was erratic in her actions, was "melancholy and mournful" and could not understand why she did not like other people. She was moody and complained of pains in her head and abdomen and "doctored" all the time. She attempted to commit suicide.

The funeral director related the circumstances when decedent made arrangements for her first husband's funeral in 1936. She talked to him for twenty minutes and did not mention her husband's death until she "got up to leave." Instead of sending appropriate burial clothes for her husband, she sent a dress to the director. It is claimed that that incident arose from an innocent mistake in packages, but it was for the jury to valuate that explanation.

Decedent consulted Dr. Lowell J. Kramer of Fortuna, Hum-

boldt County, in July, 1940. He diagnosed her case as gastric neurosis, low blood pressure, hypotension, and cancer phobia, but no organic ailment. She had lost fifteen pounds over a period of three months. She seemed considerably older than she was several months before—had failed considerably in that time. He did testify that he "saw no evidence of insanity." He testified: "Q. Her mind seemed to be perfectly clear at all times. A. With the possible exception of that phobia." However, he also stated that the act of committing suicide was abnormal and answered the following hypothetical question: "Q. What would your opinion of a person be who in 1922 threw herself into a river and attempted suicide. . . . In an attempt to commit suicide and was pulled out and who thereafter at least six or seven times threatened to commit suicide, did commit suicide on December 2nd of 1940, that prior thereto, a month or two or two months, the time is a little indefinite, told her husband that she would or might commit suicide, a woman who at one time purchased a high priced animal for $175.00 then disposed of it for a little or nothing, had to get rid of it, who at time three or four years, in 1937 or 1938 was in a business transaction, a transaction completely closed and the deeds had been drawn up and delivered and after all this was done she wrote a letter in which she stated that she wanted these quit-claim deeds to be made out and placed on record, when it already had been done; a woman that complained about her head, laid down a great deal, complained that she was not able to do her work; a woman that in drawing up her will left her property to a man she had been married four months to, cut out completely her only child, only daughter; who complained a great deal of headaches, she had low blood pressure, would you say a person that had such characteristics, . . . whether she was of sound or unsound mind. . . . A. I would strongly suspect she was of unsound mind if all those facts were true." He further testified that the "committing of normal acts did not obviate the possibility of an abnormal mind"; that when the person acted normally—had lucid intervals he could transact business.

Proponent on the other hand produced an array of witnesses who testified as to the soundness of decedent's mind and contradicted other evidence offered by contestant. Attorneys with whom decedent consulted during 1940 regarding the disposition of her property including Mr. Ricks, the drafts-

man of the will, and other persons acquainted with her, testified that her mind was sound. Evidence is pointed to which it is asserted explains the instances of decedent's conduct above referred to. The value or credibility of those explanations was for the trier of fact. Reference is made to evidence that she handled her first husband's business affairs for many years, he being blind, and that she was a careful and cautious business woman. To review those conflicts is not the function of this court. The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case. (*Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Estate of Miller,* 16 Cal.App.2d 154 [60 P.2d 498]; *Estate of Ramey,* 62 Cal.App. 413 [217 P. 135]; *Estate of Gill,* 14 Cal.App.2d 526 [58 P.2d 734]; *Estate of Doolittle,* 153 Cal. 29 [94 P. 240]; *Estate of Snowball,* 157 Cal. 301 [107 P. 598]; *Estate of Cashion,* 27 Cal.App.2d 689 [81 P.2d 628]; *Estate of Allan,* 15 Cal.App.2d 272 [59 P.2d 425]; *Estate of Caspar,* 172 Cal. 147 [155 P. 631]; *Estate of Arnold,* 147 Cal. 583 [82 P. 252]; *Estate of Webster,* 43 Cal.App.2d 6 [110 P.2d 81, 111 P.2d 355]; *Estate of Ross,* 199 Cal. 641 [250 P. 676]; *Estate of Johnson,* 200 Cal. 299 [252 P. 1049]; *Estate of Barr,* 69 Cal.App. 16 [230 P. 181]; *Estate of Russell,* 189 Cal. 759 [210 P. 249].) An excellent statement of the rule appears in *Estate of Bristol, supra.* Although the issue was whether a codicil had been destroyed by the testator, the general rule is stated at page 223:

"The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when

considering a jury's verdict. The critical word in the definition is 'substantial'; it is a door which can lead as readily to abuse as to practical or enlightened justice.''

A somewhat different theory was expressed in *Estate of Casarotti*, 184 Cal. 73, 78 [192 P. 1085], where this court said: ''The testimony of proponent's witnesses must be taken into account in weighing the sufficiency of contestant's case. Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.'' This statement was quoted in *Estate of McDonough*, 200 Cal. 57 [251 P. 916]. The last quoted excerpt cannot be considered as an accurate statement of the law inasmuch as it is contrary to the foregoing declaration in *Estate of Bristol, supra*, which has been announced so frequently that it must be considered as controlling. ■ Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.

■ Applying the foregoing rules to the facts of this case it is obvious that the many incidents of abnormal conduct, the attempts at suicide and finally death by suicide, the opinion of witnesses as to her mental condition, the disherison of her daughter and granddaughter, with whom she was friendly, when most of her property came from her first husband, the father of her daughter, in favor of proponent to whom she had been married less than six months, and finally, the opinion of the doctor who examined her, all taken together form a picture from which we must conclude that the jury by its verdict and the trial judge by denying a motion for judgment notwithstanding the verdict were reasonably justified in concluding that decedent was weak in both body and mind, and inferring that such condition existed at the time of the execution of the will. The circumstances must be viewed in the light of the mental condition of decedent. ■ The mental and physical condition of the testator are factors to be considered on the issue of undue influence. (26 Cal.Jur. 669-670.) In the instant case, in addition, we have a husband and wife living together, and hence, a fiduciary relation

existing between testatrix and proponent. A fiduciary relationship exists between husband and wife in respect to the issue of undue influence in a will contest, and where such fiduciary relationship is combined with unduly profiting by the will, and its being unnatural, and activity on the part of the proponent in procuring its execution, we have persuasive evidence of undue influence. (See *Estate of Nutt,* 181 Cal. 522 [185 P. 393]; *Estate of Baird,* 176 Cal. 381 [168 P. 561]; *Estate of Olson,* 19 Cal.App. 379 [126 P. 171]; *Estate of Shay,* 196 Cal. 355 [237 P. 1079]; *Estate of Gallo,* 61 Cal. App. 163 [214 P. 496]; *Estate of Lances,* 216 Cal. 397 [14 P.2d 768]; *Estate of Easton,* 140 Cal.App. 367 [35 P.2d 614]; *Estate of Graves,* 202 Cal. 258 [259 P. 935]; *Estate of Bleil,* 96 Cal.App. 283 [273 P. 1088]; *Estate of De Graaf,* 34 Cal. App.2d 120 [93 P.2d 199]; *Estate of Bucher,* 48 Cal.App.2d 465 [120 P.2d 44]; *Estate of Johnson,* 31 Cal.App.2d 251 [87 P.2d 900]; *Estate of Hampton,* 39 Cal.App.2d 488 [103 P.2d 611]; *Estate of Rabinowitz,* 58 Cal.App.2d 106 [135 P.2d 579].)

 In the instant case we have various circumstances which support the conclusion reached. The condition of decedent's mind. The confidential relationship between proponent and decedent. The property possessed by decedent when the joint tenancy deeds and mutual wills were made was considerably larger than that owned by proponent. Although proponent and decedent were acquainted some time before their marriage they had been married less than six months at the time the will was executed. True, the evidence is conflicting, but there is evidence that decedent and her daughter and granddaughter were on friendly terms and that decedent had spoken of leaving property to her daughter. The estate of decedent consisted chiefly of property acquired from her first husband, the father of contestant, her daughter. Yet, she made no provision for her. By the laws of intestate succession she would have inherited one-half of the estate. (Prob. Code, § 221.) Proponent went to the office of Mr. Ricks, the attorney who drafted the mutual wills and joint tenancy deeds and joined in the discussion of the terms of the will. Decedent did not discuss the matter with Mr. Ricks in the absence of proponent. Proponent telephoned Mr. Ricks' office several times to inquire whether the documents had been prepared. The day decedent committed sui-

cide he was examining papers in a box presumably belonging to her. He did not notify contestant of her mother's death, and wasted no time after the death in transferring a joint bank account that had been supplied by decedent's funds. Decedent left suicide notes containing expressions to the effect that she had one chance to take and lost. She wrote a birthday note to a friend, Mrs. Lola Lutman, just before her death telling her to take certain articles of personal property in which decedent stated: "Lola dear, don't miss me, its best. Unless you are happy, what's the use? . . . John (proponent) is swell, don't think badly of him. He's a dear. Say nothing of this to John & use it just for yourself and Bud." Proponent testified that in her last note to him, decedent "spoke about the money matters, she said that she was sorry that they couldn't agree on money matters but she said that nothing she could ever say would change his mind about money matters because he would say and think he always had to work, that's as near as I remember what was in it." What, if anything, more was said in that note cannot be known inasmuch as proponent stated that he did not know where it was—that it had been mislaid.

On the other hand there is the testimony of Mr. Ricks that there was no appearance of influence by proponent, and that he tried to dissuade decedent from disinheriting her daughter. He also testified, however, that: "Q. Did Mr. Teel in any manner appear to dominate or influence the will of Mrs. Teel in the preparation of those papers or the execution of them. A. Well there was no apparent domination in words or anything that were used, but I just had an intuition I wanted to delay the matter, I didn't like the looks of the whole thing. Q. Yes, but Mr. Ricks, had there been any indication to influence there in your office, you would not have permitted her to sign at that time would you. A. I saw no evidence of influence." He prepared proponent's will also at the same time as that of decedent. He kept decedent's will in his office and she never asked for it or sought to change it. Decedent had consulted other attorneys alone with reference to the disposition of her property. However, proponent accompanied her to the offices of those attorneys and remained there while the attorneys consulted with her alone. Attorney Mace had never seen her before, and attorney Mitchell stated: "I know he (proponent) was in at one time and I heard him tell Mrs.

Friend 'Well you talk to Mr. Mitchell and I will meet you at some time later at some particular place,' but I don't remember the dates or details you know, that's a year or more ago.'' Mr. Mitchell had previously acted as decedent's and proponent's attorney. Moreover, those visits to other attorneys' offices must be considered in the light of the premarriage property settlement agreement between proponent and decedent, and the other circumstances. There is also evidence that decedent told those attorneys that she wanted her husband to have her property. However, all that can be said on this subject is that there was a conflict in the evidence and that the trier of fact resolved that conflict against proponent. The rule heretofore stated with regard to the respective functions of the trier of fact and an appellate court is applicable.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., and Schauer, J., concurred.

EDMONDS, J.—In my opinion there is no substantial evidence whatever to support the verdict which is upheld by the decision in this case, and the facts upon which the jury determined that the disposition which the testatrix made of her property should be set aside fall far short of the requirements laid down by the heretofore unbroken rules relating to the proof necessary to set aside a will.

At least until the present decision, testimony showing that one had the opportunity to influence a testator, even where it was shown that he had the interest or motive to do so, has not been held to justify the invalidation of a will. (*Estate of Gleason,* 164 Cal. 756 [130 P. 872].) And even the evidence tending to prove that influence was exercised to procure the making of a will has been said to be an insufficient ground for setting it aside. ''The mere fact that one person has been influenced by the arguments or entreaties of another is not enough to make the influence an undue one. It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in.fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another.'' (*Estate of Anderson,* 185 Cal. 700, 707 [198 P. 407].)

According to the testimony of H. L. Ricks, the attorney who prepared the will of Mrs. Teel, it was written at her request and in accordance with her wishes. When she first came to his office she told him that she wished to make a will in favor of her husband, leaving nothing to her daughter. Her husband was with her at the time, but there is no evidence that the visit was made at his suggestion or direction. On the contrary, the evidence shows that on previous occasions Mrs. Teel had consulted other attorneys; at one time she secured legal advice when her husband was not present.

When she visited Mr. Ricks, he attempted to dissuade her from disinheriting her daughter and told her to go home and think the matter over. But from the information given to him at the time by Mr. and Mrs. Teel he prepared reciprocal wills, incorporating the provisions specified by them. Subsequently the two returned and executed these wills before Mr. Ricks and Selma G. Burgess as subscribing witnesses. Although the attorney did not talk to Mrs. Teel alone, and she and her husband were present when each will was signed, there was nothing in the conduct of the parties, Mr. Ricks testified, indicating any domination of Mrs. Teel by her husband. Mrs. Burgess also told the jury that the testatrix was not acting under duress, menace, fraud or undue influence.

Before consulting Mr. Ricks, the appellant and his wife had obtained other legal advice but there is no evidence to indicate that this was done at Mr. Teel's solicitation. E. S. Mitchell, one of the attorneys consulted, testified that in 1940 Mrs. Teel called upon him at least twice in reference to the disposition of her property. Mr. Teel was probably present at one of these interviews, said Mr. Mitchell, but he did not participate in the conversation. At the other visit, the attorney talked to Mrs. Teel alone. She told him that she had received a letter from her daughter demanding a share of the estate of the girl's father. Mrs. Teel asked if she was free to dispose of her property by will in accordance with her own wishes. The attorney advised her that she could do so, but the testimony does not indicate that he was asked to draw a will for her.

There is nothing in the testimony regarding her consultation with Delos A. Mace, the other attorney, to indicate that Mrs. Teel's husband took her to his office. Mr. Mace testified that when she and Mr. Teel came to see him, and she stated

the purpose of her visit, he took her into his private office, and that Mr. Teel did not participate in the conversation. Mrs. Teel said that she wanted to leave all of her property to her husband; very emphatically she stated that her daughter was not to receive anything. After a discussion of the matter she said that she would think the matter over but she did not return.

In support of the jury's finding of undue influence, the contestant calls attention to the prenuptial agreement of Mr. Teel and the testatrix to make reciprocal wills, each naming the other as sole beneficiary, as evidence that he married her for her money. Emphasis is also laid upon the testimony showing that when Mr. Teel and his wife went to the office of Mr. Ricks, Mr. Teel discussed with her and the attorney the terms of the wills and the deeds which were also to be prepared. At that time he had with him certain documents and he made arrangements to provide the attorney with the legal descriptions of property. The contestant also points out that Mr. Teel later telephoned to the attorney on several occasions to inquire if the documents had been written; he was present when the will of his wife was executed and took possession of the deeds which were signed at that time. Because there was a confidential relationship between Mr. Teel and his wife, it is argued, and he unduly profited by the will which was obtained under those circumstances, the verdict rests upon substantial evidence.

But to set aside a solemnly executed will, upon the ground of undue influence, the appellate courts of this state have repeatedly held that a contestant must show coercion destroying free agency upon the part of the testator. (*Estate of Keegan,* 139 Cal. 123 [72 P. 828].) Evidence of opportunity, even if coupled with a motive to influence the testamentary act is not sufficient. (*Estate of Kilborn,* 162 Cal. 4 [120 P. 762].) Nor does proof of circumstances consistent with the exercise of undue influence meet the law's requirements; the facts relied upon must be inconsistent with voluntary action on the part of the testator. (*Estate of Donovan,* 114 Cal.App. 228 [299 P. 816].) And the evidence must show more than general influence, however strong and controlling; influence which invalidates the instrument must be ''a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.'' (*Estate of Carithers,*

156 Cal. 422, 428 [105 P. 127] ; *Estate of Gleason, supra,* at p. 765 ; other cases stating and applying this rule are *Estate of Hopkins,* 136 Cal.App. 590, 602-603 [29 P.2d 249] ; *In re Calkins,* 112 Cal. 296 [44 P. 577] ; *Estate of Clark,* 170 Cal. 418, 424 [149 P. 828] ; *Estate of Anderson, supra,* at pp. 707-708.) In short, as this court very recently said, ''it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will.'' (*Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25].) And although, since the decision in *Estate of Baird,* 176 Cal. 381 [168 P. 561], when one stands in a confidential relation to a testator and has participated in procuring the execution of a will by which he unduly profits as a beneficiary a presumption of undue influence arises, the rule strictly requires the concurrence of each of these factors. However unnatural a will may appear to be with regard to the natural objects of a testator's bounty, said this court in upholding the Baird will, such fact is not alone sufficient to sustain a finding of undue influence. Nor is evidence of a confidential relation alone sufficient. ''There must be activity on the part of the beneficiary in the matter of the preparation of the will.'' (P. 384.)

A further restriction upon the rule giving the contestant of a will the benefit of a presumption of undue influence under the circumstances which have been stated was made by the District Court of Appeal when it declared: ''The instances will be found rare where our Supreme Court has permitted a will to be upset solely upon the ground of undue influence where the charges have been made against the husband or wife. No presumption is permitted to be indulged against this relation in this state, and it is not permitted in most other jurisdictions.'' (*Estate of Carson,* 74 Cal.App. 48, 65 [239 P. 364].) This conclusion was, in part, based upon the case of *In re Langford,* 108 Cal. 608 [41 P. 701], where it was said that a wife may justly influence the making of her husband's will for her own benefit so long as she does not act fraudulently. ''Accordingly, the circumstance that the testator's wife urged upon him the propriety of leaving his property to her does not constitute undue influence to vitiate the will. . . . And the mere fact that the will of the husband is changed to gratify the wishes of the wife does not raise a presumption of undue influence on her part. . . . In order to

set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.'' (P. 623.)

But disregarding the limitation which has been applied in the marital relation, I can find no substantial evidence either that Mr. Teel procured the preparation and execution of the will in his favor or that he unduly profited by it. It has been held that active participation in procuring the execution of a will cannot be inferred from the mere fact that the beneficiary accompanied the testator to the office where the will was drawn. (*Estate of Morcel*, 162 Cal. 188 [121 P. 733] ; *Estate of Easton*, 140 Cal.App. 367 [35 P.2d 614].) And in *Estate of Shay*, 196 Cal. 355 [237 P. 1079], this court, in reversing a judgment revoking probate of a will, said that the participation of the testator's children in procuring the execution of the instrument was not shown by evidence that a son, at his sister's request, mentioned the will to his father; that his father thereupon requested him to take notes and give them to a friend for preparation of the will; that he delivered the notes as requested and thereafter procured a copy of the will which he read to his father, who declared himself satisfied with its provisions; and that he then arranged for the execution of the will but was not present when the instrument was signed. In the present case, the evidence of participation by the beneficiary shows much less activity than that of either Shay's son or daughter.

Also the fact that the testatrix had more property than her husband and the value of his distributable interest under the will is more than she would have received had he predeceased her does not supply the factor of undue profit within the meaning of the rule. Even had Mrs. Teel left no will, her husband would have taken one-half of her estate under the laws of succession (Prob. Code, § 221) ; and as they had also executed joint tenancy deeds of their real property which constituted a considerable portion of Mrs. Teel's estate, the amount by which Mr. Teel benefited by the will is not large, even accepting contestant's valuation of her estate at the time the will was executed as being approximately $24,000.

A will cannot be set aside upon the sole ground that it is unjust or unnatural (*Estate of Martin*, 170 Cal. 657, 663 [151 P. 138]) and an unfair or unjust will creates of itself no presumption of incompetency or undue influence (*Estate of Smith*,

200 Cal. 152, 160 [252 P. 325] ; *Estate of Putnam,* 1 Cal.2d 162 [34 P.2d 148]). Moreover, a will that favors a spouse over an adult daughter is not necessarily unnatural. This is especially true, as in the present case, where the daughter is a married woman, living with her husband, is self supporting and not dependent upon her mother. (*Estate of Stone,* 172 Cal. 215, 222 [155 P. 992].)

For these reasons, in my opinion, the judgment should be reversed.

Traynor, J., concurred.

Appellant's petition for a rehearing was denied January 25, 1945. Edmonds, J., Traynor, J., and Spence, J., voted for a rehearing.