[Civ. No. 14417.   First Dist., Div. Two.   July 25, 1950.]

Estate of GEORGE E. BECKER, Deceased.   GEORGE H. BECKER, Respondent, v. IRMA BECKER, Appellant.

Talley & Carver, William R. Talley and Clifford R. Carver for Appellant.

Fabius T. Finch and James Martin MacInnis for Respondent.

DOOLING, J.—Appellant, the widow of decedent George E. Becker, appeals from a judgment following the verdict of a jury denying probate to a will purportedly executed by decedent on September 10, 1947, on the ground of incompetency.

George E. Becker for some time prior to his death was suffering from cancer of the jaw which brought about his death on September 17, 1947.   He was attended during his last illness by his son George H. Becker, the contestant, who is a licensed physician.   On August 29, 1947, the contestant took his father to an attorney's office where the father executed a will leaving the contestant his only property, a lot in San Francisco improved with a two-flat dwelling with a life estate in one of the flats reserved to appellant, his wife.

On September 3, 1947, contestant again took his father to the same lawyer's office where at the father's direction a new will was drawn directing the sale of the property and the

division of the proceeds equally between his wife and his son, with provision that the wife might have a lease on the flat in which they were living for a limited period after the testator's death. This will was executed on September 5 in the lawyer's office in the presence of one of his associates, the lawyer who drew the will being that day out of town. At the time of its execution a provision for $40 per month rental to be paid by the widow in case she elected to take the lease provided for was inserted at the testator's suggestion.

On September 10 the will in contest was signed in the decedent's bedroom, having been drawn by another lawyer who was summoned for the purpose by decedent's wife through the medium of a neighbor. By its terms all of decedent's property was given to his wife to the exclusion of his son.

The contestant son, who saw his father daily, morning and evening, except on September 10 when at the suggestion of the wife he did not call in the evening, testified that his father's condition was one of progressive mental deterioration. Between August 29 when the first will was executed and September 3 when the second visit to the lawyer was made he had bceome noticeably more cloudy and confused and by September 5 when the second will was executed he was, in contestant's opinion, barely competent and able to understand what he was doing. Thereafter he became progressively worse and by the morning of September 10 in this witness' opinion:

"He was incompetent.

. . . . . . . . . . . . . . . .

"Q. Were you of the opinion on that day that your father was capable of exercising any of his faculties of free will whatsoever? A. No."

In the opinion of the witness this mental condition had been reached on September 8 at the latest. Asked if after September 8 his father ever exhibited "any change in mental condition which would have cause (*sic*) you to feel that for even a brief time he became restored to a partial mental competency," the contestant answered: "No; these patients don't."

Decedent was seen on September 3 by two physicians who had been treating him and on September 5 by a third. All agreed in testifying that on those dates the decedent's mentality was being rapidly sapped by his acute physical condition. It was explained that the cancer in the position that it occupied in the jaw pressed upon a major artery leading to the brain and a major vein leading from it, the effect being

gradually to diminish the supply of blood to the brain as the cancer grew in size; that toxic material from the cancer also gradually poisoned the system including the brain and that the position of the cancer interfered with the free ingestion of food. The combination of these factors in the opinion of the medical witnesses who had observed decedent would inevitably result in a complete loss of mentality as he reached the terminal stage and his condition was progressive so that once the mind was gone decedent would have no moments when his mind could function. In the opinion of these witnesses, from decedent's condition when they last saw him, by September 10 he would have had no true mentality left.

Opposed to this evidence was the testimony of witnesses who saw him on that date and later that on September 10 he was able freely to discuss his property, his son and wife and to direct how he desired his will of September 10 to be drawn; and the fact was proved that as late as September 12 in his own handwriting he executed a direction to a bank to admit an attorney to his safe deposit box. The direction to the bank was admittedly copied in language suggested by the bank to the attorney and some of the medical witnesses stated that decedent on September 12 might be able to copy such a document although in their opinion he would not understand it. As one physician put it a child who cannot read or write may copy the word "cat" but he will not because of that know its meaning.

We approach the decision of the question whether the evidence is sufficient to support the finding of incompetency to execute the will of September 10 controlled by the rule announced in *Estate of Teel,* 25 Cal.2d 520, 526 [154 P.2d 384] (quoting from *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]) :

"The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably

deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' ''

It is true that there was substantial evidence, as above indicated, that decedent possessed and exhibited on September 10 and afterwards testamentary capacity; but the medical evidence from physicians who had observed him, including contestant who saw him every day, was that by September 10 his physical condition was such that he was no longer able to exercise any more than the most automatic and habit-formed mentality. If that was believed by the jury, as it must have been, then they were entitled to disbelieve the testimony of his mental activity produced by proponent and her witnesses, since it has been said by our Supreme Court that "it is elementary that direct evidence may be disbelieved and contrary circumstantial evidence relied upon to support a verdict or finding." (*Gray* v. *Southern Pacific Co.*, 23 Cal.2d 632, 641 [145 P.2d. 561].)

*Estate of Teel*, *supra*, 25 Cal.2d at page 527 disapproved *Estate of Casarotti*, 184 Cal. 73 [192 P. 1085], and *Estate of McDonough*, 200 Cal. 57 [251 P. 916] which had formulated the rule that: "The testimony of proponent's witnesses must be taken into account in weighing the sufficiency of contestant's case."

Appellant points out the distinction between medical incompetency and legal incompetency to make a valid will (*Estate of Arnold*, 16 Cal.2d 573, 585 [107 P.2d 25]) but here from the medical evidence the jury was entitled to find that on September 10 decedent no longer had the mental ability to think or reason on any subject or to entertain any idea; and while, as appellant points out, it is the mental condition at the very moment of executing the will which is decisive (*Estate of Peterkin*, 23 Cal.App.2d 597, 604 [73 P.2d 897]) the medical testimony of physicians who had observed him, was that on September 10 his mind was so far gone that, because of the progressive nature of his illness, there was no possibility of decedent understanding what he was doing or having any recurrence of active mentality.

The evidence shows that decedent would ask for air and water and sometimes write those words on slips of paper furnished for that purpose. The medical testimony was that decedent's ability to perform these simple acts or to be so far roused as to momentarily recognize some person and speak

his name was attributable to habit and was not inconsistent with the complete loss of mentality to which they testified. Recognizing the rule that the loss of mentality in these cases must be so complete that the testator can no longer remember his property or the objects of his bounty (*Estate of Sexton,* 199 Cal. 759, 764 [251 P. 778]) we are satisfied that there is substantial evidence from which the jury could draw the conclusion that on September 10 the decedent had reached this condition.

Judgment affirmed.

Nourse, P. J., concurred.