[Civ. No. 21955.   Second Dist., Div. One.   May 8, 1957.]

Estate of LOUIS JACQUES MARIE COLLIN, Deceased. ELVIRE POPESCO et al., Appellants, v. FLORENCE RYAN et al., Respondents.

Charles A. Thomasset for Appellants.

Pacht, Ross, Warne & Bernhard, Isaac Pacht, Ellis J. Horvitz, Tannenbaum, Steinberg & Shearer and Robert Weil for Respondents.

FOURT, J.—This is an appeal from a judgment by the court, sitting without a jury, admitting to probate the will of decedent dated December 19, 1951, and denying admission to probate of a purported will executed by decedent on October 24, 1952. Respondents Louis E. Swarts and Florence Ryan, as petitioners, filed their petition for the probate of the will of decedent dated December 19, 1951 (hereinafter referred to as the "Ryan will"). In the Ryan will Florence Ryan and Eva Devynck were named devisees and legatees of the decedent's entire estate. Elvire Popesco filed objections to the above petition, contending that the Ryan will was not the last will of decedent and that Louis Verneuil had made a later will dated October 24, 1952 (hereinafter sometimes referred to as the "propounded Popesco will"). Thereafter, proponent Lee D. Mathews filed his petition for letters of administration with-the-will-annexed, wherein he propounded for probate the Popesco will dated October 24, 1952, which would have revoked all prior wills and left the entire estate to Elvire Popesco. Florence Ryan filed objections to the petition for probate of the Popesco will propounded by Lee D. Mathews, and a contest thereto, and objections to the petition of Lee D. Mathews to be appointed administrator with-the-will-annexed, and to the admission of the Popesco will.

Elvire Popesco and Lee D. Mathews filed a contest to the Ryan will, the grounds, among others, being that the December 19, 1951, will had been revoked by a will dated October 13, 1952 (hereinafter referred to as the Tambour will), and by the terms of the propounded Popesco will. Elvire Popesco and Lee D. Mathews and Jean Collin Du Bocage filed their

answer to the objections filed by respondent Ryan, and their contest to the Ryan will; Florence Ryan and Louis E. Swarts answered the contest filed by Elvire Popesco and Lee D. Mathews.

The Societe Des Auteurs and Compositeurs Dramatiques then filed a petition for the probate of a purported will of decedent dated October 27, 1952 (hereinafter referred to as the "Societe will"), to which objections and contest were filed by Florence Ryan. The Societe answered the objections and contest of Florence Ryan, and alleged that the Ryan will had been revoked by the propounded Popesco will, executed October 24, 1952.

After a trial the court determined and found that the decedent was of sound mind when he executed the Ryan will and that such will is the last will of decedent; that the decedent was of unsound mind and lacked testamentary capacity and was suffering from insane delusions and hallucinations from February 2, 1952, until his death on November 3, 1952; further, that the will offered for probate by the appellants dated October 24, 1952, and other documents purporting to be wills of the decedent bearing dates respectively, October 4, 1952, October 13, 1952, and October 27, 1952, were all invalid for any purpose for the reasons set forth above. The judgment was in conformity with the findings.

Louis Verneuil committed suicide on November 3, 1952. He was a successful French playwright who came to the United States just before the Nazi invasion. In 1945, he came to Hollywood where he met Florence Ryan, who was then a secretary to Sol Lesser, a motion picture producer, for whom Louis Verneuil had contracted to write a screen play. Thereafter a friendship developed between Miss Ryan and Louis Verneuil.

Florence Ryan testified that she was 55 years of age and worked as a confidential secretary to Sol Lesser for 20 years, from 1925 to 1945, at which latter time she met Louis Verneuil. She frequently went to dinner with him and when he had a heart attack in September of 1945, she visited him nightly when he was in the hospital. She drove his automobile for him, loaned him a total of $34,750; she loaned him money to settle an attachment which was made for back taxes owing to the government. He proposed marriage to her. She organized his contracts and copyright records and coached him in English. In 1947, she was expected nightly for dinner at his home on Faring Road. Eva Devynck, Louis

Verneuil's secretary from France, visited with Verneuil at his home during July, 1947, and brought all of his household goods, library files, and manuscripts with her from Paris. Louis Verneuil told her that Eva Devynck had been his secretary since 1930; that she was an intelligent and capable person and most devoted and honest. In 1949, Verneuil told her that he had drawn a will in which he had left everything to her (Miss Ryan). She told him that she thought it unfair to omit Eva Devynck from his will. At Verneuil's invitation, she moved into the Faring Road home in January, 1950, and she lived there until his death. In 1950, he wrote a successful play, "Affairs of State," and asked her opinion concerning it during rehearsals at his home. When Verneuil went on the road with the play before it opened in New York, he and she wrote to each other daily. In 1951, she stopped working for Sol Lesser and went to work for Verneuil. She went to Florida with him after he became ill in the fall of 1951. After they returned to Los Angeles, he became ill again in December, and she gave him medication under the supervision of doctors. On February 2, 1952, Verneuil talked to her as if she were a stranger, stating that he was the worst criminal in the world and asking to be turned over to the police. He was completely incoherent. From then on he had delusions and hallucinations about the house having been wired for television to the end that every word spoken would be recorded and every move photographed. He stated, among other things, that there was a television camera placed in his fireplace directly in front of his desk where he worked, and that there were television cameras in his bedroom; that there were shows concerning him going on 24 hours a day all over the United States. While staying in Laguna with her, the decedent said that everybody was laughing at him; that the water sprinklers in the hotel room were microphones to pick up the conversations and that it all had been ordained ahead of time. After February 2, 1952, he spoke each day about his being on television, about being ridiculed when people on the street recognized him, saying that all of the taxi drivers, colored chauffeurs, soldiers, sailors and marines in particular, laughed every time he appeared on the screen. He told her that she, too, was a part of the conspiracy to ridicule him and to make fun of him. He told her all of his files had been searched by the F.B.I., and all of the books in his library had been taken out and reprinted over night and then put back

in the same bindings, so as to confuse him. He stated that the newspapers delivered to his house were special editions for his sole benefit—that all of his friends were in a conspiracy against him. He stated that his deceased wife was not in fact dead, but she merely pretended to die in 1940, and she was alive and hiding somewhere in France to make him appear ridiculous for believing she was dead. Frequently he shut himself up in a dark room. He threatened suicide many times. On one occasion he indicated the place where he had contemplated suicide by jumping from a tall building; on another occasion he asked if the sharp knives had been hidden so that he could not use them to commit suicide, though in fact the knives had not been hidden. In the spring of 1952, he said he was going to take a trip to France to ascertain whether the conspiracy which existed against him in the United States also existed against him in France, and whether his family and friends were in conspiracy against him. She attempted time and time again to convince him that there was no conspiracy against him. At a theatre in New York, on May 19, 1952, two days before he was to leave for France, he stood up in his seat during the intermission, and then stated, "Everybody in the theatre laughed at me, everybody recognized me, everybody knows me from the television shows that are going on." He was addicted to the use of sleeping pills and took 100 of them with him when he left for France; two weeks after his arrival in France, he cabled for 300 more. On May 2, 1952, when he left California for France, he did so with $10,000 worth of travelers checks sewed into his pants, and $10,000 worth sewed into his vest, and $5,000 more sewed into his coat. Between May 2, 1952, when he left for France, and November 2, 1952, when he committed suicide, she received many letters from him and nine transatlantic telephone calls, including a 20 minute call on Sunday night, November 1st, the eve of his suicide.

One of the letters Miss Ryan received from him was written on October 27, 1952, wherein he set forth, among other things:

". . . marriage always brought me bad luck. I do have a kind of superstition against it and I wanted to be happy with you for ever. So, as I am a free man, I had to find a strong reason not to marry you. It was a lie, granted. But certainly a well-meant one, and which did not harm anyone.

. . . . . . . . . . . .

"All right, it does not matter. For some unknown reason, I have been the victim of the most fantastic plan and joke

ever staged,— and by the biggest country in the world: the United States. What can I do? . . . My house was searched between August and December, 1951, all my files and books visited, and some marked with pencil, there is no doubt about that. And so were unquestionably searched all my drawers and the two safes. I did not know a Democracy could do that. Anyway, it was done. Then, by some device, my face and name were made known to the whole American people.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"This does not remove the fact that you were, for years, the most charming, devoted, generous, tender person I ever met. And I wish to thank you, once more, for the years of happiness you gave me. You were good, sincere, marvelous . . . until sometime in 1951. Then you did switch to take part in the National Joke. But when? . . . That I don't know, of course. It was so gradually, so marvelously done! . . . What a wonderful actress you are! . . . But why bother about 'when'? . . . I lost you. That is the tragedy to me. The rest is unimportant.

"Under those circumstances, I will not come back to America. Never. It is crushing, because it is the country in which I was the happiest (thanks to you). But what can I do? . . . I have been thinking it over for five months. . . . They have, in fact, forced me to leave. . . . No one can bear to live in a country of 162 millions people, where everyone recognizes you in the street, and laughs at you! . . . In a way, it is worse than the electric chair.

"Besides, I wanted to come back mainly—I should say: only—to live with you. And your sudden moving out of Faring, then our last telephone conversation, then your last cable, made it clear that you don't want me any more. If anyone had told me that, even last February, even last May . . . I would never have believed it! . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"But I won't bother about anything since, on May 21st, 1952, I left New York by plane, and found myself traveling only with extras, with a sewart who made the service of a fool, and a stewardess, a brunette, who looked much more like a brothel-hoare than a plane attendant, and addressed me several times in the most sarcastic way. I am saying that all passengers were extras, because none (out of 30 or 40) had a decent shirt or collar, none had any luggage, and all had the hands of killers, or, anyway, of very poor people, who never went to a manicurist in their life. People who

can afford to cross the Atlantic by plane, do not have that kind of shirts, or that kind of hands.

"Besides, when we left New York, the plane went South, so as to make me believe that we were going to Mexico, or Peru, or God knows where! . . . Then, without my being able to notice it, of course, they turned around, and went to England and France.

"So, they had a special plane, for me alone! . . . And don't tell me again that I should see a psychiatrist, and that I am mentally ill. I am not at all. I know the foregoing is true.

"But, again, I say: it does not matter . . . I no longer dress . . . I no longer wash . . . I no longer eat . . . I stay in bed. . . . And, even if Popesco's hospitality was charming, I left Mezy. I am now, momentarily, in some hotel . . . And I'll soon move . . . I don't know where! . . . That is why I gave you my brother's address. He will probably always know where to reach me.

"As far as the Faring Road house is concerned, goodbye also to that beautiful dream! . . .

.  .  .  .  .  .  .  .  .  .  .  .

"As for all my files, scripts, and everything else: the result of 40 years of work . . . I don't care. Do with them whatever you wish . . . It seems the incinerator will be plenty busy! . . .

"However, I would very much like to receive all my clothes (shoes, linen, etc. . . .), including those I brought from Paris to America in 1940. They were practically new then, and I never wore them since. And I am so thin now that I could use them. Thank you.

"And this will be the end of my 12 years in America . . . of Faring Road . . . (for which you and I fought so hard) . . . and of our love.

"I'll say it a thousand times: I just cannot understand how and when you could have switched that way . . . and why! . . . I remember San Francisco, Santa Barbara, La Jolla . . . and so many other beautiful recollections . . . I can still see your sad face, one evening, in 1946, when I had thought of having a wall built by Mac, in the 2nd floor hall, between your bedroom and mine . . . *You did love me* then, I'm sure of it, and even much later than that. What could have made you change? . . .

"But I won't insist, I realize it is so futile! . . . Be happy, my darling, that is the only thing that counts. . . . But, with

such wealthy bosses, who can afford to have a special plane for me alone, I am not worried for you! . . . Your future is safe! . . . After what you did for 'them,' and the prominent part you played for months, they just can't let you down!

"Even if you made so much fun of me since last December (and probably sooner than that) thank you again for all you did before. You'll always remain my great and only love, and, as long as I live, an unundertandable, but perfectly adorable recollection.

.  .   .   .   .   .   .   .   .   .   .   .   .   .

"Still, I will always be happy to hear from you in the future. And I still love you with all my heart, even if it makes you laugh or shrug.

"Goodnight, my sweet darling

Louis.''

Eva Devynck testified that she was 60 years of age, and had been married 34 years; that she was Verneuil's secretary for 22 years, and lived near Paris. She stated that before Verneuil came to the United States in 1940, she attended to his correspondence and did his secretarial work. From 1940 to the date of his death he wrote her 1,091 letters, and she wrote him 1,007 letters. In 1941, she had a power of attorney from him to collect all of his royalties, and in 1945, she had a general power to take charge of everything of his. During the Nazi occupation of France she occupied his house to keep it from being requisitioned by the Germans. After the Germans left Paris, she went from house to house looking for the furniture which had been taken from the establishment, and brought it back piece by piece to restore the facility, even though she was warned that much of the furniture had been "boobytrapped" and she risked being blown up. In 1947, she went to Berlin to try to collect some of his royalties from German publishers at a time when that city was divided into sectors, and thereby risked falling into the hands of the Russians. She met Verneuil at the airport when he landed in Paris in May, 1952, and saw then that he was gravely ill. He did not seem to recognize her. He said he thought he was on an island in the Pacific, and did not believe he was in France. He stated that the airplane from which he had just landed was not a real airplane and that his fellow passengers on the flight were not real persons, but were actors playing the part of travelers, and that he could not understand why such large sums of money were being expended for such pur-

poses. He inquired about who was plotting against him, and who was spending such large sums of money for that purpose; he said that he could not escape them, even if he went to Japan. He looked under the bed for microphones. He said he did not think his first wife was dead. When he and she went to pick up his return-flight ticket to the United States on July 12th, he did not believe the ticket was a real one and turned it back, stating that the conspiracy continued. Further, she testified that Verneuil lived at Madam Popesco's home for a time, then in a hotel, then again at Madam Popesco's, and then in the home of an actress friend, and then back at the hotel, where he died. He had stated that he had no money left, no furniture—that there was nothing left.

Dr. Eliot Corday, a member of the U.C.L.A. medical facility and co-chief of cardiology at the Cedars of Lebanon Hospital, testified that he treated Verneuil in 1947, and from time to time until sometime in May, 1952. He further testified that Verneuil was afraid of everything; that he had developed delusions; that Verneuil had told him about people taking television pictures of him, and that everybody was against him. He further stated that in January and February of 1952, Verneuil was confused; that he showed distrust of his household, and showed signs of mental deterioration, and that he had symptoms of persecution paranoia.

Sol Lesser testified that in the summer of 1952, he went to Paris and met Verneuil there, and found that Verneuil's "mind was not what he (Lesser) had known it to be"; that Verneuil was completely irresponsible and unbalanced; that he was suffering from many hallucinations and delusions, and that he was "deranged or something."

Dr. Norman Levy testified that he was a professor of psychiatry in the U.S.C. Medical School and had read and considered the reporter's transcript of the testimony of Florence Ryan, Eva Devynck, Dr. Corday and Sol Lesser; also, certain letters from Verneuil to Florence Ryan and certain letters from Verneuil to Eva Devynck. Further, he testified that based upon his examination of the items just set forth, he formed an opinion as to the mental condition of Verneuil between February 2, 1952, and November 2, 1952, which opinion was in substance that Verneuil showed evidences of mental and emotional disturbances, the most conspicuous of which were his ideas and apparent delusions of persecution. Also, on the basis of the testimony and exhibits examined by

him, the doctor testified that Verneuil had delusions and that it was his opinion that a man who had $68,000 in cash on his person and who felt he could not pay for ordinary meals or a room in a hotel was suffering from delusions; that he had no insight into his ideas about the conspiracies against him and that these ideas continued and seemed never to disappear. It was further the doctor's opinion that Verneuil, on October 27, 1952, had the delusion that Miss Ryan had joined a conspiracy against him, in which the United States government was involved, and that he was the victim of a fantastic plan and joke against him.

█ Other witnesses, without setting forth a summary of their testimony, testified in the proceedings. It is enough, however, to say that there is ample evidence in the record to show that Verneuil, from February 2, 1952, to his death, suffered continually from paranoiac persecutions, delusions and hallucinations; that his delusions progressed and he included his closest friends and associates in the so-called conspiracy; that during the last of such an existence he made out four separate wills, changing beneficiaries each time. Within a few days or so after executing the last of the purported four wills, he killed himself. It is uncontradicted that before he was victimized with the delusions and hallucinations referred to, Florence Ryan was his close and trusted companion and the object of his love and affection, and that Eva Devynck for 22 years had been his devoted and loyal secretary, and that both were the natural objects of his bounty.

Appellants' main contention is that there is insufficient evidence to sustain the findings. It is admitted by them that the conclusions are in harmony with the findings, and apparently it is admitted that the findings support the judgment. Our courts have repeatedly held that the trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case, and in *Estate of Teel*, 25 Cal.2d 520, at page 527 [154 P.2d 384], it is said, "All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed."

In our opinion, the evidence clearly establishes that the four October, 1952, wills were the product of delusions or hallucinations, and that such mental condition bore directly on the creation and terms of the wills. The trial judge could

well have inferred that but for such delusions and paranoid beliefs, Verneuil would not have attempted to alter his will of December 19, 1951. A finding by the trial judge that the testator lacked testamentary capacity, buttressed by such evidence as was produced in this case, will not be disturbed on appeal. (*Estate of Teel, supra,* 25 Cal.2d 520; *Estate of Russell,* 189 Cal. 759 [210 P. 249] ; *Estate of Wasserman,* 170 Cal. 101 [148 P. 931] ; *Estate of Fosselman,* 48 Cal.2d 179 [308 P.2d 336] ; *Estate of Becker,* 98 Cal.App.2d 574 [220 P.2d 766] ; *Estate of Halbert,* 80 Cal.App.2d 666 [182 P.2d 266] ; *Estate of Krause,* 71 Cal.App.2d 719 [163 P.2d 505] ; *Estate of Sandman,* 121 Cal.App. 9 [8 P.2d 499] ; *Estate of Lingenfelter,* 38 Cal.2d 571, 581 [241 P.2d 990].)

The fact of the suicide itself, standing alone, might well be insufficient to establish testamentary incapacity, but it is a factor which the trial judge should, and apparently did, take into account with all of the other evidence. (*Estate of Teel, supra; Estate of Lingenfelter, supra; Estate of Dolbeer,* 149 Cal. 227 [86 P. 695] ; *Estate of Chevallier,* 159 Cal. 161 [113 P. 130] ; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149] ; *Estate of Rich,* 79 Cal.App.2d 22 [179 P.2d 373].)

Appellants assert that there was no testimony that at the very time or moment Verneuil executed each of the four instruments in question he was laboring under illusions or delusions, or was incompetent; in other words, that no one testified that in October, 1952, on the dates the purported wills were executed, the decedent was not competent to make a will. ■ Proof of testamentary incapacity and of the facts upon which a testator's state of mind depends is not necessarily confined to the exact time or moment of the execution of the will. (*Estate of Frank,* 102 Cal.App.2d 126 [226 P.2d 767] ; *Estate of Hartley,* 137 Cal.App. 630 [31 P.2d 240] ; *Estate of Alexander,* 111 Cal.App. 1 [295 P. 53] ; *Estate of Ivey,* 94 Cal.App. 576 [271 P. 559] ; *Estate of Johnson,* 72 Cal.App. 663 [237 P. 816] ; *Estate of Barr,* 69 Cal.App. 16 [230 P. 181] ; *Estate of O'Connor,* 51 Cal.App. 339 [196 P. 792] ; *Estate of Perkins,* 195 Cal. 699 [235 P. 45].)

Appellants contend further that it was error to receive the testimony of Dr. Levy and that the objections thereto should have been sustained, as the opinions expressed were lacking in foundation and were incompetent. Dr. Levy read and considered the transcript of the testimony of Florence Ryan, Eva Devynck, Dr. Eliot Corday and Sol Lesser, together with the letters written by decedent and introduced in evidence. The

doctor was then asked the question: "Not basing your opinion or founding your opinion upon the opinion of any witness in this case as to the mental capacity of Mr. Verneuil, but solely based upon the testimony which was given by Miss Ryan and Miss Devynck as to the conversations had with Mr. Verneuil and the correspondence that you have examined, I will ask you if you have an opinion as to his mental capacity, and to give, state it.''

█ An objection was made to the question and counsel for the respondent argued to the court that the question was nothing more than a hypothetical question, framed in a different way; that here a transcript of the testimony had been prepared to the end that the witness could have the advantage of studying the exact phraseology and the exhibits as well. The objection was overruled and the doctor then testified that in his opinion Verneuil suffered from delusions of persecution from February, 1952, continuously until the time of his death; that from June 16, 1952, Miss Ryan was included in the deceased's paranoid ideas and subsequently, Miss Devynck as well. The witness was cross-examined extensively and the doctor went into detail and related the precise evidence upon which his opinion was based. Appellants have called to our attention the case of *People* v. *Le Doux*, 155 Cal. 535 [102 P. 517], as being authority for their contentions. The facts of that case are not similar to the facts of this case, and we do not believe that the rule set forth in the Le Doux case necessarily applies in the instant case.

Had the question been put in the usual form of a hypothetical question, nothing of importance would have been included therein which was not before the doctor in the transcript of the testimony of the witnesses in question and the exhibits examined. Further, had the question been put in the usual hypothetical manner, a great deal of extra time would have been consumed in asking the question, and surely, no one would argue that by so proceeding, the doctor would have been in a better position to have given an intelligent opinion. There is no assertion here that the testimony of the witnesses in question was contradictory or conflicting in any wise. Neither is there any assertion here that exhibits considered were in any wise in conflict with the testimony of either of the witnesses referred to.

Much has been written on the subject of hypothetical questions, and many of the writers have urged that, in practice, the use of the hypothetical question in presenting expert

opinion has been so grossly abused as to be almost a scandal. Judge Learned Hand referred to it as ''the most horrific and grotesque wen on the fair face of justice.''

In 2 Wigmore on Evidence, 3rd edition, 1940, section 686, it is stated: ''Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justice Holmes' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence.

''The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth. In the first place, it has artificially clamped the mouth of the expert witness, so that his answer to a complex question may not express his actual opinion on the actual case. This is because the question may be so built up and contrived by counsel as to represent only a partisan conclusion. In the second place, it has tended to mislead the jury as to the purport of actual expert opinion. This is due to the same reason. In the third place, it has tended to confuse the jury, so that its employment becomes a mere waste of time and a futile obstruction.

''No partial limitation of its use seems feasible, by specific rules. Logically, there is no place to stop short; practically, any specific limitations would be more or less arbitrary, and would thus tend to become mere quibbles.

''How can the extirpating operation be performed? By exempting the offering party from the *requirement* of using the hypothetical form; by according him the *option* of using it,— both of these to be left to the trial Court's discretion; and by permitting the opposing party, *on cross-examination*, to call for a hypothetical specification of the data which the witness has used as the basis of the opinion. The last rule will give sufficient protection against a misunderstanding of the opinion, when any actual doubt exists.

''The foregoing proposals, be it understood, represent a mere practical rule of thumb. They do violence to theoretical logic. But in practice they would produce less actual misleading of the jury than the present complex preciosities. After all, the only theoretical object of the hypothetical question (*ante*, § 672) is to avoid misunderstanding; and 'if the

salt have lost its savor, wherewith shall it be salted? It is thenceforth good for nothing but to be cast out and trodden under foot of men.' The present proposal does not tread under foot the hypothetical question, but merely transfers its function to the hands of the cross-examiner.''

Uniform Rules of Evidence, rule 58, reads as follows: ''Questions calling for the opinion of an expert witness need not be hypothetical in form unless the judge in his discretion so requires, but the witness may state his opinion and reasons therefor without first specifying data on which it is based as an hypothesis or otherwise; but upon cross-examination he may be required to specify such data.''

Rule 409 of the Model Code of Evidence reads: ''An expert witness may state his relevant inferences from matters perceived by him or from evidence introduced at the trial and seen or heard by him or from his special knowledge, skill, experience or training, whether or not any such inference embraces an ultimate issue to be decided by the trier of fact, and he may state his reasons for such inferences and need not, unless the judge so orders, first specify, as an hypothesis or otherwise, the data from which he draws them; but he may thereafter during his examination or cross-examination be required to specify those data.''

The substance of the last above mentioned rule is found in section 9 of the Uniform Expert Testimony Act.

It is our view that under the circumstances of this case, it was within the discretion of the court to admit the testimony in question. The trial judge was able to determine whether there was any conflict in what was said by the witnesses Florence Ryan, Eva Devynck, Dr. Corday and Sol Lesser, and whether the exhibits conflicted with any of the testimony of the witnesses and whether the transcript was too voluminous.

In any event, we cannot see whereby there could possibly have been the slightest prejudice worked against the appellants by reason of the form in which the question was put in this case. And we hold that the asking of the question in the form as indicated, and the answer given, did not result in any prejudicial error to the appellants. Even if the doctor's testimony is not considered, the record contains a great sufficiency of testimony and other evidence to sustain the court's judgment.

The final contention of appellants is that the evidence does not sustain the finding of the court to the effect that the

four purported wills executed by the decedent in 1952, had not been admitted to probate in France, nor proved nor established in accordance with the laws of France. In this connection, suffice it to say that William B. Stern, the foreign-law librarian of the Los Angeles County law library since 1939, whose testimony was not even alluded to by the appellants in their brief, testified with reference to this subject, and his testimony was sufficient to support the findings of the court in this connection. No useful purpose would be served by setting forth the résumé of his testimony.

The order admitting the will propounded by the respondents to probate and denying probate to the will propounded by the appellants is affirmed.

White, P. J., and Doran, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 3, 1957.