[Civ. No. 16012. First Dist., Div. One. Sept. 27, 1954.]

Estate of WOODARD WHITFIELD KERR, Deceased. WOODARD WHITFIELD KERR, JR., Respondent, v. ETHEL ELNORA KERR, as Executrix, etc., and as Legatee, Appellant.

Nathan G. Gray for Appellant.

George P. Finnegan, Fred B. Mellman, Russell P. Studebaker and Harold W. McKinney for Respondent.

WOOD (Fred B.), J.—A purported will executed July 23, 1952, by Woodard Whitfield Kerr, was admitted to probate. Woodard Whitfield Kerr, Jr., a son of the decedent, filed a contest upon two grounds, unsoundness of mind and undue influence. The trial court found that decedent was of sound mind and memory but that his signature to the instrument was obtained by the undue influence of the proponent, Ethel Elnora Kerr, wife of the decedent. From the judgment revoking probate of the will and from an order denying a motion to vacate the judgment and enter a different judgment, the proponent has appealed.

Proponent claims (1) that the judgment is not sustained by the evidence and (2) the conclusions of law and the judgment are not supported by the findings of fact. We will consider the latter question first.

The findings include probative facts as well as ultimate

facts, expressed in such a manner that the ultimate facts are limited by and dependent upon the probative facts found. Thus, in paragraph II, the court found "that said instrument was not, on the day it bears date, or at any other time, executed by said Woodard Whitfield Kerr with the intent to constitute the same his last will and testament, but that to the contrary, it is true that at the time and place of the signing of said instrument by said decedent, his signature to said instrument was obtained by the undue influence of the proponent *as is hereinafter more fully found and set out*"; in paragraph III, "that said Woodard Whitfield Kerr was coereced [coerced] into signing said writing by the undue influence of Ethel Elnora Kerr and that thereby, and not otherwise, the said Woodard Whitfield Kerr was induced to sign said purported will *by reason of the facts hereinafter found to be true*"; and, in paragraph IV, "That it is true that *the undue influence exercised by said Ethel Elnora Kerr*, hereinafter referred to as proponent, in procuring the execution of said purported will *consists of the following facts and of the following acts* on the part of said Ethel Elnora Kerr; [detailed statement of the probative facts] . . ." (Emphasis added.)

Findings comparable to the passages above quoted from paragraphs II and III (minus the italicized portions) are deemed findings of ultimate facts, not mere conclusions of law. (*Hick* v. *Thomas,* 90 Cal. 289, 296 [27 P. 208, 376]; *Weger* v. *Rocha,* 138 Cal.App. 109, 111, 113 [32 P.2d 417]; and see *Capital Nat. Bank* v. *Smith,* 62 Cal.App.2d 328, 340 [144 P.2d 665].)

When, as here, the ultimate facts are tied in with and made dependent upon the probative facts found, we must look to the probative facts for their support, not to the evidence which tends to support the ultimate facts. " 'It is, of course, well settled that a general and ultimate finding . . . which is drawn as a conclusion from facts previously found, cannot stand if the specific facts upon which it is based do not support it' (*McKay* v. *Gesford,* 163 Cal. 243, 246 [124 P. 1016, Ann.Cas. 1913E 1253, 41 L.R.A.N.S. 303]) that is, if the probative facts are not susceptible of a construction that will support the judgment. (*Quinn* v. *Rosenfeld,* 15 Cal.2d 486, 491 [102 P.2d 317]; *Matter of Forrester,* 162 Cal. 493, 495 [123 P. 283]; *People* v. *McCue,* 150 Cal. 195, 198 [88 P. 899]; *Hammond Lbr. Co.* v. *Barth Invest. Corp.,* 202 Cal. 606, 609 [262 P. 31]; *Loud* v. *Luse,* 214 Cal. 10, 12 [3 P.2d 542]; *Fitzpatrick* v. *Underwood,* 17 Cal.2d 722, 727 [112

P.2d 3].)'' (*Garrison* v. *Edward Brown & Sons,* 25 Cal.2d 473, 478 [154 P.2d 377].) This calls for an examination of the probative facts found by the court in the instant case. A summary of them follows:

Decedent and one Tacy Kerr were married in 1913 and had four children, including contestant, now adults and still living at the time of the alleged execution of the purported will. The marriage was dissolved by divorce. Decedent subsequently married proponent in September, 1946, and was still married to her at the time of his death. At all times prior and subsequent to her marriage, proponent knew that decedent executed a purported will dated August 10, 1944, leaving his estate to his first wife and said four children, in equal shares. At no time during his marriage to proponent did decedent ever discuss the making of a new will until 8 a. m. on July 23, 1952, the day before he died. On numerous occasions after the marriage of decedent to proponent, both orally and in writing, decedent declared his desire to provide for his said children upon his death. During June, 1952, proponent learned that decedent was suffering from a fatal disease. Decedent was admitted to the hospital as a bed patient on July 18, 1952, where he remained until death. Proponent knew that contestant, executor and beneficiary under the 1944 will, was expected to arrive from West Allis, Wisconsin, his residence, between 8 and 9 a. m. on July 23, 1952, to visit decedent. She went to the hospital at 8 a. m. that day and while alone with decedent discussed the making of a new will.

At 9 a. m., that day, she telephoned Nathan G. Gray, attorney at law, and informed him that decedent requested him to prepare a will naming proponent as executrix and leaving the whole of decedent's estate to her. Gray said that he would prepare the will and bring it to the hospital later on said day. At 11:30 a. m., that day, contestant arrived at the hospital and was in decedent's room together with proponent for one hour during which she made no mention of decedent's request for the preparation of a will or of her conversation with Gray nor of Gray's intended visit to the hospital. Between 12:30 and 3 p. m., that day, proponent remained away and upon her return was in the presence of decedent and contestant, for one half hour and the making of a new will was not mentioned. Contestant departed at 3:30 p. m. and remained away from the hospital until 7 p. m. Between 1 and 4 p. m. decedent was observed to be speaking incoherently. Between 4 and 4:30 p. m. he was suffering pain and during

that period was given a sedative, demerol. Gray arrived at 4 and had with him the will prepared in final form; at no time prior thereto had decedent discussed with Gray the making of a new will. Between 4 and 4:30 p. m. decedent signed the will by making his mark; he was in such a weakened condition that he could not raise his arm to the paper, nor was he able to write his name. The will was read to decedent by Gray who asked decedent if he understood that everything goes to his wife and decedent nodded affirmatively. Decedent in the presence of Gray and John F. Wight affixed his cross to the document; Gray subscribed decedent's name at the end thereof in the presence of decedent and Wight; Gray and Wight signed as attesting witnesses in decedent's presence and in the presence of each other; all of which acts were done after Gray had asked decedent whether he understood the document to be his will and whether said acts met with his approval, and decedent nodded affirmatively. At all times during said proceedings leading up to the signing and at the time of the signing, proponent was physically in the presence of decedent. At no time during said proceedings were any of the other relatives present. At no time during said proceedings was decedent asked the nature of his estate nor was the nature of his estate discussed in his presence nor did the decedent speak of his estate or the nature thereof, nor was any mention made of his children nor were they specifically mentioned in the will. Decedent lapsed into a coma at 7 p. m. that day and died at 1:30 a. m. on July 24, 1952. At no time after the alleged execution of the purported will did proponent inform contestant of the execution thereof though she had ample opportunity so to do.

These facts do not, of themselves, furnish sufficient support for the finding of the ultimate fact that decedent's signature to the will was obtained by the undue influence of proponent.

■ We start with the general rule that a will "may not be held invalid on the ground of undue influence unless there be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution of the will." (*Estate of Llewellyn*, 83 Cal.App.2d 534, 561 [189 P.2d 822, 191 P.2d 419].) No one could seriously claim that the probative facts found by the court furnish any such "actual showing."*

---

*Contestant makes no such claim. Indeed, his brief is devoted to a discussion of the sufficiency of the evidence. It is silent concerning the sufficiency of the probative facts found.

■ There is an exception to this general rule, expressed in *Estate of Llewellyn, supra,* in these words: ". . . where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the testamentary document was not induced by coercion or fraud. ■ When proof of the existence of a confidential relationship between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will, is offered, a presumption of undue influence arises therefrom." (P. 561 of 83 Cal.App.2d.)

■ Here there is the confidential relation, as shown by the probative facts found. But those facts do not show that proponent would unduly profit; they are devoid of information on that subject. Also, they are meager on the subject of proponent's activity in the preparation of the will. The fact that she went to the hospital early that morning and discussed with decedent the making of a new will is consistent with her testimony that she came there in response to his request and that when she arrived he instructed her to have a will drawn giving everything to her. The trial court may have disbelieved that testimony (see *Blank* v. *Coffin,* 20 Cal.2d 457, 460-462 [126 P.2d 868]), but we do not know if it did or not, and cannot ourselves weigh proponent's testimony against evidence and potential inferences of opposite import. We conclude, therefore, that the probative facts do not bring this case within the scope of the exception which would give rise to a presumption of undue influence in support of the ultimate fact found. The order revoking probate of the will of July 23, 1952, should be reversed.

■ It does not necessarily follow that proponent is entitled to a judgment terminating the contest in her favor. There is evidence which, we believe, would support a finding of undue influence. Thus, there is evidence that as the disease progressed decedent became increasingly dependent upon proponent for his care, and except for the care and medication given by his doctor and the hospital he became completely dependent upon her until his death. The attending physician visited the decedent in the "mid morning" of July 23d and observed that decedent's tongue and all the membranes of his mouth were swollen and there were numerous small hemorrhages. He bled from the mouth. He could make himself understood with "some difficulty." That evidence tended

to conflict with proponent's testimony that between 8 and 9 o'clock that morning decedent was having no trouble with his tongue; he talked perfectly all right and had no difficulty with his speech whatsoever. There was evidence that on Friday morning, two days after the signing of the will, proponent told contestant that Mr. Gray (the attorney) had been to the hospital but that she did not know what took place. That testimony, if believed by the trier of the facts, would have a very important bearing upon the question of proponent's activities, if any, in procuring the will. In a letter written by proponent, postmarked two days prior to the date the will was signed, she indicated awareness that decedent was approaching the end, saying in part, ''I don't know how long he can go on this way, the doctors say they are sure it can't be long. I don't know whether it will be a week or two or a day or two, he is so very sick'' and ''he has quit eating and can hardly talk.'' There was evidence also that proponent was concerned as to whether she should have decedent sign the pink slip to the family automobile before he died and that she obtained the signature about July 20, three days before the signing of the purported will. There is also evidence tending to show that at the time of the marriage of the decedent and the proponent he had separate estate of a value of about forty thousand dollars, later making her a joint tenant of about twenty-five thousand dollars' worth of it and that the net value of the probate estate is in excess of eight thousand dollars. We are not undertaking to narrate all of the significant evidence. We think we have described enough of it to indicate the basis of our conclusion that there should be a new trial of the contest in view of the broad scope of the evidence and the restricted area of the findings. The importance of the function of the trier of the facts in passing upon all of the evidence, determining the credibility of witnesses, weighing the evidence and resolving all conflicts, is the same in will contests as in other civil cases. (*Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689]; *Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384]; *Estate of Jamison*, 41 Cal.2d 1 [256 P.2d 984].)

 The order denying proponent's motion under sections 663 and 663a of the Code of Civil Procedure should be affirmed because, although the judgment rendered was erroneous, proponent was not entitled to a judgment terminating the contest. Under those sections the only order within the power of the court is one setting aside the judgment and

directing as a part of the same order the entry of another judgment. (*Dolan* v. *Superior Court*, 47 Cal.App. 235, 236, 241 [190 P.2d 469]; *Prothero* v. *Superior Court*, 196 Cal. 439 [238.P. 357].)

The order denying proponent's motion to vacate the judgment and enter a different judgment is affirmed. The judgment is reversed and the contest remanded for a new trial on the issue of undue influence alone.

Peters, P. J., and Bray, J., concurred.

. Respondent's petition for a hearing by the Supreme Court was denied December 15, 1954. Schauer, J., was of the opinion that the petition should be granted.

