[Civ. No. 266. Fifth Dist. Aug. 1, 1963.]

Estate of JESSIE SAULS, Deceased. VIOLET KEITH et al., Plaintiffs and Appellants, v. MARY ELIZABETH GRAHAM, Defendant and Respondent.

Ronald E. Bates for Plaintiffs and Appellants.

Mitchell & Fulfer and E. Paul Fulfer for Defendant and Respondent.

CONLEY, P. J.—This is an appeal from an order admitting to probate the last will and testament of Jessie Sauls. The contestants, Violet Keith, a niece of decedent, and Henry Cadwell, who was beneficiary under a preceding holographic will, appeal.

The decision of this case requires the application of the well-established rule that if a trial court has substantial evidence to support its findings and order, the appellate court is without power to interfere with the conclusion of the court below. Our review is necessarily limited then to the question whether or not the trial judge had ample evidence upon which to base his findings; if the answer is affirmative, we must approve the order, even if there is other evidence in the record which, if it had been accepted by the trier of fact, would have justified a contrary order equally unassailable on appeal.

In *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689], it is said: "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing

court, are the same in a will contest as in any other civil case.''

In *Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384], the Supreme Court points out the duty of an appellate court in reviewing a decision in a will contest as follows: ''All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.''

(See also *Estate of Barr*, 69 Cal.App. 16, 33 [230 P. 181]; *Estate of Snowball*, 157 Cal. 301, 305 [107 P. 598]; *Estate of Jamison*, 41 Cal.2d 1, 13 [256 P.2d 984]; *Estate of Kirk*, 161 Cal.App.2d 145, 150 [326 P.2d 151].)

Viewed in accordance with the foregoing rules, the evidence was ample to support the trial judge's decision on each of the two grounds upon which the will contest was based: (1) the claim that decedent was not of sound and disposing mind at the time she executed the will, and (2) the allegation that she was subjected to undue influence by the beneficiary under the will, Mary Elizabeth Graham.

Jessie Ann Sauls was admitted to the City Hospital in Modesto on November 8, 1961. For several months she had been suffering from illness involving congestive heart failure and arteriosclerosis; she recently had had an acute episode of difficult breathing and nervousness. Her regular family doctor, David J. Jamieson, was unavailable, and an office associate of his, Dr. D. W. Semmens, was in actual attendance.

On the day after her admission Mrs. Sauls was visited both in the morning and afternoon by Mrs. Graham, who was the sister of Mrs. Sauls' deceased husband, and by Mr. Graham. Mrs. Sauls later that day told another patient, Beverly Johnson, who occupied the hospital room with her, that she wanted to see Mrs. Graham. And on November 10 she again told Mrs. Johnson that she wished to talk with Mrs. Graham.

On the afternoon of November 10, Mrs. Graham and her husband came again to the hospital, and Mrs. Sauls told her that she wanted to have a will drawn on that day, and according to Mrs. Graham's testimony, said to her, ''You've been the only one in my family that's ever done anything for me and ever taken care of me. . . . I want you to take over and I want you to pay my doctor bills and hospital bills. . . . Honey, if there is fifty cents left, I want you to

have it, . . ." Mrs. Johnson, also in the room, heard the conversation.

The Grahams had a will drawn by an attorney in accordance with the directions given by Mrs. Sauls and returned with it to the hospital between 6 and 8 o'clock that evening. Mrs. Graham asked the nurse, Alta Walter, to come into Mrs. Sauls' room to read the will to her and to witness it if it should be executed by her. Mrs. Walter and a second nurse, Sylvia Wigger, went into the room after Mrs. Walter checked her chart to determine whether Mrs. Sauls had taken any narcotic. Mrs. Walter read the entire will to Mrs. Sauls, a part at a time, asking her as she read whether or not she understood it. When Mrs. Walter finished reading, she asked Mrs. Sauls if this was what she wanted, and Mrs. Sauls replied, "Yes." After Mrs. Sauls personally examined the will, it was formally executed.

There is no question as to compliance with the formal requisites for the execution. The court found: "That said Will is in writing signed by the testatrix and attested by three subscribing witnesses. That said testatrix acknowledged the Will in the presence of said witnesses, present at the same time, and that said witnesses signed the said Will at the request of said testatrix in the presence of said testatrix, and in the presence of each other."

But contestants urge that Jessie Ann Sauls did not at the time she signed it have the mental capacity to execute a will. On direct examination Alta Walter testified that when Mrs. Sauls signed the document all of the witnesses were present, that the testatrix stated that the document was her will, that she asked the witnesses to sign as such, and that Mrs. Sauls was of sound and disposing mind and memory at the time. On cross-examination Mrs. Walter said that by November 10 Mrs. Sauls had improved from the time when she was admitted and that "she knew what she was doing" when she executed the will; the witness read the will to Mrs. Sauls, because she wanted to be sure that Mrs. Sauls knew what she was signing before she, Mrs. Walter, placed her own name on it as a witness. Afterwards, Mrs. Sauls read or looked over the will herself. The decedent did not need, and was not given, any assistance in writing. The nurse also testified that the reason she said Mrs. Sauls was improved was that when Mrs. Sauls was admitted to the hospital she didn't know what she was doing; she had spells of being confused the following day or two, but her mental condition improved.

Mrs. Walter also testified that Mrs. Sauls told her in a conversation about 3 or 3:30 p.m. on November 10, that she had a personal matter to complete with Mrs. Graham and that she wanted Mrs. Graham to help her make out her will.

Sylvia Wigger, a licensed vocational nurse, was present in the hospital on November 8, when Mrs. Sauls was admitted; she testified that the decedent was then quite confused and restless; the witness saw her at about 4 p.m. on November 9, at which time Mrs. Sauls was quiet and said she was "Pretty good." The nurse gave her a phenobarbital tablet. She saw her at about 3:30 p.m. on November 10, and spoke to her as she passed her room going down the hall; Mrs. Sauls returned the greeting; about 5 p.m., at meal time, the nurse asked her how she felt; Mrs. Sauls replied, "Pretty good"; Nurse Wigger said, "You look better today," and she said, "I feel better." The nurse testified Mrs. Sauls did not appear to be upset and that she fed herself. About 6:30 or 7 o'clock in the evening Nurse Wigger was called into the room to witness the will; Mrs. Sauls then appeared to be quite alert, and she took the will in her hands and signed it without help. On cross-examination, the witness testified that at the time of signing the will Mrs. Sauls was receiving nasal oxygen, but she was not under an oxygen tent. Mrs. Sauls said, "Thank you" to her for signing the will as a witness. Nurse Wigger testified that Mrs. Sauls said that it was her will and that this was her wish; the testatrix turned each page of the will and appeared to be reading it.

Dr. Jamieson, called as a witness by the contestants, was asked if he had an opinion as to the capacity of a person of 78 years to understand and recall the nature and situation of her property and to remember and understand her relation to the persons who have claims on her bounty and whose interests would be affected by the provisions of her will, when such person had been admitted to the hospital on November 8 under the conditions and with the symptoms shown by the evidence, who was receiving nasal oxygen on November 10 for a good part of the day and was lethargic and confused at noon, with "Condition poor" at 3 p.m. and who received at 4:15 p.m. 25 milligrams of Sperin. The doctor answered that in his opinion such a person would not be capable of making such decisions.

Respondent points out that Doctor Jamieson was not the attending physician during the last illness and was not present at the time the will was executed. His personal observa-

tions during her stay in the hospital were made only on two occasions when he stopped in the decedent's room to talk to her; the doctor was unable to testify on what date these conversations took place, but did state that they were only two or three minutes in length; the doctor did not testify as to the patient's mental condition on either of these visits. The hypothetical question asked the doctor did not include personal observations; evidently, his opinion was based solely on the hospital record.

The hospital record from which the doctor testified had an entry concerning the patient's mental state—a notation made November 10 between 12 and 2 p.m.: "Very lethargic, confused." There were no further entries concerning the mental condition of the patient as distinguished from her physical condition on that day. Respondent points out that Dr. Jamieson admitted that the drug Sperin, of which massive dosages were given the patient on two occasions while she was in the hospital, would cause different reactions with different people, and argues that the effects of the drug would have worn off by the time she signed the will, because the doctor further admitted that if a patient, after being so treated, were able to carry on an intelligent conversation, the effects of the drug would be "just enough to sedate them but not enough to make them incompetent," and there was evidence that she did carry on such a conversation.

The trial court found: "That at the time said Will was executed to wit: on the tenth day of November, 1961, the testatrix, JESSIE SAULS, . . . was of sound and disposing mind and not acting under duress, menace, fraud or undue influence, and was in every respect competent by Last Will to dispose of all of her estate."

It is our conclusion that the trial court had ample evidence in the testimony of the witnesses Alta Walter, Mary Elizabeth Graham, Sylvia I. Wigger, Beverly E. Johnson and A. B. Graham upon which to base its finding that the decedent was of sound and disposing mind at the time the will was executed.

It is true, as contended by appellant, that evidence indicating testamentary incompetence both prior and subsequent to the exact time of the execution of a will may be sufficient to indicate the lack of a sound and disposing mind (*Estate of Collin,* 150 Cal.App.2d 702 [310 P.2d 663] ; *Estate of Fosselman,* 48 Cal.2d 179, 185 [308 P.2d 336]), and it is

834

also true that the opinions of experts, if accepted by the court, may warrant a finding of incompetency, even though other witnesses testify to the contrary (*Estate of Hansen,* 38 Cal.App.2d 99, 115 [100 P.2d 776]; *Estate of Bourquin,* 161 Cal.App.2d 289, 298 [326 P.2d 604]); but these principles do not overcome the basic rule that the trial court has the duty to make its findings after weighing and considering all evidence of every kind legitimately received and that if there is substantial evidence supporting the findings as made, the appellate court cannot interfere with the result.

The mental condition of a testatrix at the time of the execution of a will is a question of fact to be determined by the trier of fact, and it should be remembered that physical infirmity, disease and sickness do not prevent the making of a will, unless such pathological conditions rob the testator of a sound and disposing mind. (94 C.J.S., Wills, § 29, pp. 727-728.)

The claim of undue influence also must be resolved factually: "Whether or not there was undue influence at the execution of a will is a question of fact, . . . The function of the trier of fact is the same as in other civil cases. Hence a finding of the trial court on that issue will not be disturbed on appeal where there is conflicting evidence or where the evidence would have been sufficient to support either one of the conflicting contentions." (53 Cal.Jur.2d, Wills, § 165, pp. 402-403.)

While it is true that the trial court assumed, to give contestants the benefit of the doubt, that there was a confidential relationship between the decedent and the proponent, and while it is true that pursuant to the instructions of the testatrix, Mrs. Graham herself, the sole beneficiary, went to the attorney who drew the will and told him what Mrs. Sauls had said she wanted incorporated in it, and such combination of confidential relationship, activity and profit under the will would raise an inference of undue influence (*Estate of Abert,* 91 Cal.App.2d 50, 58 [204 P.2d 347]; *Estate of Lances,* 216 Cal. 397, 403 [14 P.2d 768]; *Estate of Shay,* 196 Cal. 355, 363 [237 P. 1079]; *Estate of Kerr,* 127 Cal.App.2d 521, 526 [274 P.2d 234]), it was still a matter for the determination of the court from all of the evidence in the case whether or not undue influence did in fact exist (*Estate of Abert, supra; Estate of Teel, supra,* 25 Cal.2d 520, 526); the court had the power under the present record to find as it did; that the court felt strongly convinced in this respect is

indicated by the statement made by it in the memorandum opinion included in the clerk's transcript:

"In the Court's mind there is no evidence whatever to suggest any basis for the claim of undue influence by Mrs. Graham.

"It is true that she procured the execution of the Will and was there when it was signed. It is true also that she and the decedent were friendly and a confidential relationship might be said to exist and therefore there would be a presumption of undue influence. But, even allowing for this presumption, the evidence of the disinterested witnesses, both nurses, Alta Walter and Sylvia Wigger; and of Beverly Johnson, . . . would more than counter-balance any presumption."

The order admitting the will to probate is affirmed, respondent to recover her costs on appeal in accordance with the stipulation of the parties on file herein.

Brown (R.M.), J., and Stone, J., concurred.