[Civ. No. 23793.   First Dist., Div. One.   Mar. 1, 1968.]

CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU, Plaintiff and Respondent, v. JOYCE E. DEARING et al., Defendants and Appellants.

718

Raymond H. Hawkins and Russell W. Federspiel for Defendants and Appellants.

Marquart, Hutchins & Staiger and Warren A. Staiger for Plaintiff and Respondent.

SIMS, J.—In this action for declaratory relief, commenced by an insurer (California State Automobile Association Inter-Insurance Bureau, a reciprocal inter-insurance exchange), the named insured (Joyce E. Dearing), her minor son (Gary R. Dearing), who resided in her household, the victims (Muriel Brown Johansen and Hans Milton Johansen) of an accident in which an automobile operated by the minor son was involved, and their insurer (Hartford Insurance Company, a corporation) which furnished them property damage and uninsured motorists coverage, have all appealed from a judgment which absolved the Bureau of any responsibility for furnishing coverage for the accident in question. The automobile operated by the minor at the time of the accident was not the vehicle particularly described in the policy, and the controversy revolves about its status at that time.

The insurer agreed as follows: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of: (a) bodily injury . . . ; (b) injury to or destruction of property, . . . ; arising out of the ownership, maintainance or use of the owned automobile or any non-owned automobile, . . ."

The persons insured were defined in the following terms: "(a) With respect to the owned automobile, (1) the named insured, (2) any other person using such automobile, provided the actual use thereof is with the permission of the named insured; (b) with respect to a non-owned automobile, (1) the named insured, (2) any relative, but only with respect to a private passenger automobile, . . . , provided the

actual use thereof is with the permission of the owner; . . ."

Definitions in the policy included the following:

" 'relative' means a relative of the named insured who is a resident of the same household;

" 'owned automobile' means a private passenger, . . . automobile owned by the named insured and described in the declarations, . . .

" 'non-owned automobile' means an automobile . . . not owned by or furnished for the regular use of either the named insured or any relative, . . ."

Under the heading "Conditions," subheading "Premium," the policy stated, ". . . If the named insured acquires sole ownership of an additional private passenger, . . . automobile . . . , he shall inform the Bureau within thirty days following the date of its delivery. Any premium adjustment necessary shall be made as of the date of such change or acquisition. . . ."

The named insured and her minor son contend that the vehicle the latter was driving at the time of the accident was a "non-owned automobile" within the terms of the policy, and that the Bureau is therefore obligated to furnish coverage. The victims and their insurer argue that the vehicle was covered as an additionally acquired owned automobile within the provisions last quoted. Each have attacked the findings of fact and conclusions of law which have led to a contrary result, and each contends that the evidence requires a judgment declaring that the Bureau should furnish coverage. A review of the record reflects that within 30 days prior to the accident there was such a transfer of the vehicle as to bring it within the coverage the Bureau offered for an additionally acquired automobile. The judgment must be reversed.

*Statement of Facts*

The following facts, gleaned from the findings, are uncontroverted. On June 19, 1961, Tom Martin and Margaret Martin, the grandparents of Jeffery R. Hadden, then a minor,[1] were the registered owners, under the laws of Michigan, where they resided, of a 1956 Chevrolet sedan bearing Michigan license plates # UL 4217. In June 1962, Hadden left this automobile, which was then inoperable because of a dam-

---

[1]Tom Martin, Margaret Martin and Jeffery R. Hadden were originally named as defendants in the declaratory relief action, but the action was dismissed as to them, and as to all fictitious defendants at the pretrial conference.

aged engine, in Alameda County in the care and custody of his friend Dave Rosen, a minor, and gave him authorization to find a purchaser for the car. Rosen at the time was living in the home of Mrs. Dearing. In August 1962, Gary Dearing, with the consent and permission of Rosen, but without the knowledge of Hadden, who had returned to Michigan, commenced working on the automobile to make it operable. Thereafter and until the accident, with the express or implied permission of his mother, Gary repaired, assembled, disassembled, pushed, towed, drove, used and otherwise assumed and exercised control over the automobile, which was usually parked and worked on in front of the Dearing home.[2]

Meanwhile, on July 5, 1962, the Martins affixed their signatures to a certificate of title assigning to Hadden all of their interest in the Chevrolet. On August 29, 1962, the Michigan authorities issued license plates # UL 5249 for that automobile to Hadden, and on September 12, 1962, they issued a certificate of title numbered D 728305 to Hadden covering the same car. Hadden had previously, in June 1962, paid the sum of $129 to extinguish a recorded bank lien against the vehicle.

In January 1963, a telephone call was made to Hadden. (According to Hadden this call was from Mrs. Dearing. Mrs. Dearing denied that she ever discussed the purchase of the car with Hadden. Rosen testified that he telephoned Hadden concerning Mrs. Dearing's offer to purchase the car, and the court so found.) The content and effect of this conversation is disputed and is hereinafter discussed. On February 4, 1963, a money order for $150 was purchased and forwarded to Hadden for the purchase price of the car.

On February 26, 1963, while Gary was driving the 1956 Chevrolet, it collided with the Johansens' vehicle. Thereafter, the Johansens recovered a judgment against Mrs. Dearing and her son for a substantial sum of money. Hartford paid the victims for the damage to their car and for personal injuries to the limits of the uninsured motorists coverage and became subrogated to the Johansens' rights to that extent.

---

[2]The court also found that Mrs. Dearing, as the parent and natural guardian of Gary, was the signator of his driver's license application pursuant to sections 17700 through 17714 of the Vehicle Code of the State of California; that in December 1962 Gary's driving privilege was suspended for 90 days; that his mother admonished him not to drive during the period of suspension; that notwithstanding this admonition he continued to drive; and that despite notice of this conduct, Mrs. Dearing did nothing to enforce her admonition. No party has pointed out the relevancy or materiality of these facts to any issue raised on this appeal.

The original license plates, # UL 4217, issued to the Martins remained on the automobile at all times up to the time it was ultimately dismantled or destroyed sometime in April or May 1963. Although no finding was made on the matter, it was established, without contradiction, that Hadden did not sign the Michigan certificate of title, and send it, with the Michigan passenger certificate of registration, to Mrs. Dearing until May 6, 1963, almost 10 weeks after the accident.

The controverted findings and conclusions are considered below.

### Coverage as Additionally Acquired Automobile

The trial court found as follows with respect to the January telephone call: "Rosen told Hadden that [Mrs. Dearing] wanted to purchase the Chevrolet; Hadden told Rosen that if [she] would send him $150 and the Michigan license plates on the Chevrolet (License # UL 4217) that he would convey title to her; . . . that prior to May 6, 1963, Hadden did not intend to transfer title to the Chevrolet to [Mrs. Dearing] until he had physical possession of said license plates (# UL 4217)."

In its conclusions of law the court stated, "That the 1956 Chevrolet . . . owned by . . . Hadden and operated by Gary R. Dearing when it was involved in that occurrence of February 26, 1963, . . . was a non-owned automobile regularly furnished for the use of Gary R. Dearing, . . . within the meaning of the terms of that policy of insurance . . . issued by . . . [the] Bureau to Joyce E. Dearing, . . . ; that said 1956 Chevrolet was not an additionally acquired vehicle within the meaning of . . . said Policy of Insurance." A second conclusion echoed this result in more general terms.

The victims and Hartford contend that these findings and conclusions are not sustained by the evidence. They assert in the first place that there is no mention of any conditional passage of title in the conversation which Rosen testified he had with Hadden. Alternatively, they point out that even if the content of the conversation which Hadden testified he had with Mrs. Dearing properly may be interpolated into the conversation to which Rosen testified, there is no evidence to show that Rosen communicated any condition to Mrs. Dearing. Finally, they allege that in any event Rosen was authorized to sell the car and did so. In short, they contend the sale was completed on the payment of the purchase price.

Preliminarily, it is necessary to determine whether the Bureau's policy covers a newly acquired automobile. In cases

in which such coverage has been reviewed, the policy has had an express "Newly Acquired Automobile" clause, generally applicable to a replacement automobile, or to an additional automobile, if the company insures all automobiles owned by the named insured. (See *State Farm Mut. Auto. Ins. Co.* v. *Price* (1966) 242 Cal.App.2d 619, 622-623 [51 Cal.Rptr. 554]; *Williams* v. *Standard Acc. Ins. Co.* (1958) 158 Cal.App.2d 506, 508 [322 P.2d 1026]; *Everly* v. *Creech* (1956) 139 Cal. App.2d 651, 652 [294 P.2d 109]; and *Birch* v. *Harbor Ins. Co.* (1954) 126 Cal.App.2d 714, 716 [272 P.2d 784].) In the Bureau's policy the insuring agreement refers to the "ownership, maintenance or use of the owned automobile or any non-owned automobile." The policy states: " 'owned automobile' means a private passenger, . . . automobile, *owned by the named insured and described in the declarations, . . .*" (Italics added.) The declarations refer only to Mrs. Dearing's 1958 Chevrolet sport coupe. In the absence of any further reference a newly acquired owned automobile might fall in a hiatus between an "owned automobile" and a "non-owned automobile," and the policy would fail to cover the insured's liability in connection with that vehicle.

The policy, however, goes further. It provides: ". . . If the named insured acquires sole ownership of an additional private passenger, . . . automobile . . . , he shall inform the Bureau within thirty days following the date of its delivery. Any premium adjustment necessary shall be made as of the date of such change or acquisition in accordance with the manuals in use by the Bureau. The named insured shall, upon request, furnish reasonable proof of the number of such automobiles . . . and a description thereof."

This clause is similar to the clauses found in the cases referred to above in that it contemplates that the named insured will pay an additional premium for the additional private passenger automobile, and requires that he inform the insurer within 30 days following the date of its delivery. Neither of these requirements can be of any significance unless it is the intention of the insurer to furnish insurance to the named insured for that automobile as an "owned automobile."

In *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423 [296 P.2d 801, 57 A.L.R.2d 914], the opinion states: "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against

the insurer. [Citations.] If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citations.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured.'' (46 Cal.2d at pp. 437-438; and see *Wildman* v. *Government Emp. Ins. Co.* (1957) 48 Cal.2d 31, 35-37 [307 P.2d 359].) It is concluded that the uncertain provisions of the Bureau's policy warrant and require a construction that the insurer intended to furnish coverage for a newly acquired additional passenger automobile, provided that the insured informed the Bureau within 30 days following the date of its delivery. The purpose of the clause appears to be to induce the insured to purchase all his insurance from the Bureau, rather than from other insurers. (See *State Farm Mut. Auto. Ins. Co.* v. *Price, supra,* 242 Cal.App.2d 619, 624.)

Under these circumstances the law provides that the policy automatically covers the additionally acquired automobile for the 30-day period. In *Birch* v. *Harbor Ins. Co., supra,* 126 Cal.App.2d 714, the court reviewed applicable authorities and concluded: ''A reasonable person might reasonably assume from the language used that automatic coverage of a newly acquired automobile was provided for 30 days, which would then cease in the event the required notice was not given. Under any other theory, no additional protection was given the assured and this provision would be meaningless and useless. If notice was required to effect any coverage, even during the 30-day period, the insured would be just where he would have been in the absence of any such provision. Without that provision he could apply for insurance on the other car and the company could accept or reject his application. If, as appellant argues, there was no coverage during the 30 days and the company was free to refuse the risk even if notice was given, no protection was added by this provision. Unless this provision was inserted in the policy for the purpose of deception, and this should not be assumed, it meant something and was intended to confer some benefit on the insured. It may reasonably be interpreted as intended to furnish an additional

protection on a temporary basis; to be in effect, in appellant's language, 'until a reasonable opportunity was had to notify the company.' This reasonable opportunity was fixed at 30 days. If appellant's intention was otherwise, this provision should have been eliminated from the policy and such other intention more clearly expressed." (126 Cal.App.2d at pp. 720-721.)

The Bureau contends that since the car was delivered to Gary with his mother's acquiescence many months prior to the accident, the 30-day clause precludes coverage. (See *Williams* v. *Standard Acc. Ins. Co., supra,* 158 Cal.App.2d 506, 509; and *Everly* v. *Creech, supra,* 139 Cal.App.2d 651, 658.) The delivery referred to in the Bureau's policy, and in those policies referred to in the cited cases, is a delivery in connection with the acquisition of ownership. (See *Dean* v. *Niagara Fire Ins. Co.* (1937) 24 Cal.App.Supp. 762, 766 [68 P.2d 1021].) There is no suggestion here that there was any acquisition of ownership by Mrs. Dearing until she paid the purchase price on February 4, 1963, less than 30 days before the accident. Where the purchaser has possession at the time of the sale, the acquisition and delivery dates would coincide. This leads to a consideration of the question of whether Mrs. Dearing acquired "sole ownership" of the car, and, if so, when.

The Bureau and the appellants Hartford, et al., agree that the determination of whether there was a full or conditional acceptance of Mrs. Dearing's offer to purchase the car should be determined under the law of this state, because the automobile was situated here at the time of the transaction. This conclusion is supported by precedent. (*Auto Auction, Inc.* v. *Riding Motors* (1960) 187 Cal.App.2d 693, 696 [10 Cal.Rptr. 110] ; and see *Siegel* v. *Bayless* (1952) 113 Cal.App. 2d 661 [248 P.2d 968].) The trial court's reference to Michigan law, hereinafter noted, properly considers the grandparents' and seller's concern over the return of the license plates,[3] but does not indicate that ownership did pass from

---

[3] Appellants Hartford, et al., have directed attention to the provisions of section 233 of Act No. 300 of the Public Acts of 1949 of the State of Michigan, as amended and in force in 1961 [Michigan Compiled Laws of 1948, § 257.233; Michigan Statutes Annotated (Chapter 75b, Michigan Vehicle Code), § 9.1933] reading as follows:

"Section 233 (a) Whenever the owner of a registered vehicle transfers or assigns his title or interest thereto, the registration plates issued for such vehicle shall be removed and forwarded to the division or retained and preserved by the owner for transfer to another vehicle upon

Hadden to Mrs. Dearing because of any requirement of Michigan law.

██ The parties also agree that the governing principles at

application and payment of the required fees. It shall be unlawful to transfer such plates to any vehicle without applying for a proper certificate of registration describing the vehicle to which the plates are being transferred. If the owner of a currently registered vehicle subsequently acquires another vehicle without transferring or assigning his title or interest in the vehicle for which the plates were issued, the owner may have such plates transferred to the subsequently acquired vehicle upon application and payment of the required fees. (b) Whenever the assigned holder of registration plates elects to make application for a new registration certificate, the application shall be accompanied either by the old registration certificate or by a certificate of title showing him to be the assigned holder of the registration plates for which the old registration certificate had ben issued. (c) It is a misdemeanor for any person to fail or neglect to fulfill the provisions of paragraph (b) of this section. (d) The owner shall endorse on the back of the certificate of title an assignment thereof with warranty of title in the form printed thereon with a statement of all liens or encumbrances on said vehicle, sworn to before a notary public or some other person authorized by law to take acknowledgments, and deliver the same to the purchaser or transferee at the time of the delivery to him of such vehicle, which shall show the payment or satisfaction of any mortgage or lien as shown on the original title.'' Under this section, as under California law, the seller may remain liable for the negligence of the buyer, or anyone using the vehicle with the latter's permission, if he fails to indorse and deliver the certificate of title. (*Seppala* v. *Neal* (1949) 323 Mich. 697, 700-702 [36 N.W.2d 186, 187-188].) It has been noted: ''A long line of Michigan cases interpreting these statutes and their antecedents provide ample authority for the proposition that a sale in violation of these provisions is void and that monies paid under the terms of such a void contract can be recovered by the purchaser.'' (*Waldron* v. *Drury's Van Lines, Inc.* (1965) 1 Mich.App. 601, 608 [137 N.W.2d 743, 746].) In that case it was noted that no such result would follow when, as in the principal case, the vehicle was destroyed by the negligent act of the buyer. (*Terpstra* v. *Grand Mobile Trailer Sales* (1958) 352 Mich. 546, 554 [90 N.W.2d 504, 508].) The following pronouncement of the Michigan Supreme Court may be accepted as a more accurate statement of the requisites for transfer: ''If the sale of a motor vehicle is otherwise effected, title thereto passes, and the sale becomes fully consummated, upon delivery of the certificate of title properly executed. Until delivery of the assigned certificate, title does not pass, and no sale results; but delivery of the certificate of title properly assigned, notwithstanding such delivery is belated, passes title and consummates the sale.'' (*Schomberg* v. *Bayly* (1932) 259 Mich. 135, 139 [242 N.W. 866, 867].) Neither party has referred the court to a precedent involving the nature and scope of the liability of the unregistered buyer or his insured. (See, however, *Kimber* v. *Eding* (1933) 262 Mich. 670, 672-673 [247 N.W. 777, 778].)

It is noted that under the statute the license plates shall be removed and either be forwarded to the state, or preserved by the owner. The record here shows that the latest registration plates issued for the vehicle were those issued on August 29, 1962, which were apparently never attached to the vehicle and were at all times preserved by Hadden, or possibly his grandparents. Under these circumstances it would appear that the condition of the return of the plates may have been illusory insofar as it affected the liability of the grandparents, or Hadden. From all that appeared of record, the transfer to Hadden from his grand-

the time of the transaction were those set forth in former sections 1738 and 1739 of the Civil Code.[4] (*Cf.* Com. Code [effective January 1, 1965], §§ 2401, 2501, 2502 and 2509.) Under these sections it is necessary to determine the intent of the parties. (*Schuch* v. *Northrup-Jones, Inc.* (1958) 162 Cal. App.2d 279, 285-286 [328 P.2d 279]; *Everly* v. *Creech, supra,* 139 Cal.App.2d 651, 657.) The record sets forth the following evidence.

Rosen testified that he telephoned Hadden and told him that Mrs. Dearing wanted to buy the car, and that he was going to send him $150 for the purchase price. Mrs. Dearing testified that all her conversations pertaining to the purchase of the car were with Rosen. She unequivocally denied that she discussed the use or the purchase of the car with Hadden or his grandparents, or that she had ever had a conversation with Hadden on the telephone.

Hadden testified as follows: ". . . [Mrs. Dearing] said she thought she would buy it for her son, Gary, and she asked what I would take for it. Q. What did you say? A. I said, 'I am getting a little disgusted with the whole mess. You send me $150.00, and I must have the license plates, and you can have the title.' So I received the $150.00. Q. When did you receive the $150.00? A. Oh, around the first, maybe the second week of February. Q. Of 1963? A. 1963, correct. Q. And this

parents was completed. Any liability based on ownership would relate to Hadden and be predicated, not upon the license plates, which, if not forwarded to the state, should have been removed and retained by the grandparents, but upon the failure of his grandparents to deliver to Hadden, and Hadden's failure to indorse and deliver to the buyer, the certificate issued September 12, 1962.

Under these circumstances, Hadden was entitled to demand and receive from his grandparents, and Mrs. Dearing, upon payment of the purchase price, was entitled to demand and receive from Hadden, the certificate of title issued to Hadden. (*Fullwood* v. *Catsman* (1950) 329 Mich. 120, 123 [44 N.W.2d 898, 899].)

[4]These sections provided in pertinent part:

Section 1738: "(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 1739: "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer. Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed. . . ."

was to represent payment in full for your automobile? A. That is correct." He also told her that he was going to put the title in her name because Gary was a minor. According to Hadden the title was changed to his name in September or October of 1963, because he attained his majority, but he could not get "the title" to the automobile from his grandfather because "he would not turn over the title . . . until he had the license plates of the car." He acknowledged that he received the $150 as full payment for the automobile, and that "the entire delay in . . . turning over the title to Mrs. Dearing was because of the difficulty in getting title from [his] grandparents . . . and getting the plates, so [he] could give the plates to [his] grandfather." The "title" was ultimately indorsed to Mrs. Dearing and forwarded to her, although the license plates were never received.

In its minute order of decision the trial court observed: "It is my opinion that title to the 1956 Chevrolet (Michigan License Plate # UL 5249 and Michigan Certificate of Registration D 728305) did not pass from Hadden to Dearing prior to May 6, 1963. The automobile was never registered in California. Perhaps Hadden or his grandparents were familiar with Michigan laws with reference to license plates and when title to an automobile passed."

The Bureau asserts that Hadden's testimony "You send me $150.00, and I must have the license plates, and you can have the title" supports the findings with respect to the transfer of title *and* the conclusion that at the time of the accident the car was a "non-owned automobile" and was not "an additionally acquired vehicle." It contends that since the evidence is sufficient as a matter of law to sustain the judgment on this point it must be sustained. (See *Estate of Teel* (1944) 25 Cal.2d 520, 525-527 [154 P.2d 384]; *Estate of Wikman* (1906) 148 Cal. 642, 645 [84 P. 212]; and *In re Rose* (1889) 80 Cal. 166, 180-181 [22 P. 86].) The matter is not so simple. Even if the testimony of Mrs. Dearing and Rosen, which indicates there were no conditions to the sale, be disregarded, the testimony of Hadden must be considered as a whole.

It appears from the record that the car was in possession of the buyer through the actions of one to whom the seller had entrusted it to find a purchaser, and who had arranged for the transmission of the purchase price to the seller. (See Civ. Code, §§ 2026, 2367-2369; and *Siegel* v. *Bayless, supra,* 113 Cal.App.2d 661, 663-664.) The purchase price

was remitted and received. Hadden testified it was received in full payment. According to him, the reason the title was not transferred was because he could not get it from his grandfather.

These circumstances warrant and compel the conclusion that upon the payment of the full purchase price the parties intended a present sale of the chattel, which was already in the possession and control of the buyer; and that the condition, if actually communicated to the buyer, was merely to relieve the seller of his obligation to deliver documentary evidence of title. The buyer could not have demanded a return of the $150 at any time before May 6, 1963, nor could the seller have demanded a return of the car upon repayment of the purchase price. The sale was complete except for the surrender of the old plates in return for documentary evidence of title. The seller transferred all of his interest in the car, and merely protected himself from the demands of his own transferor, which in fact, were ultimately waived.

Since the vehicle was never registered in California, the failure to comply with the provisions of the Vehicle Code of this state in effecting a transfer are not determinative. (*Siegel* v. *Bayless, supra*, 113 Cal.App.2d 661, 664.) Nevertheless, the law of this state governing the liability of transferors and transferees of vehicles is instructive, in that it throws light on the distinction between a transfer of such ''property'' (*cf.* former Civ. Code, §§ 1737-1742 with §§ 1743-1760; and see Com. Code, §§ 2401-2403) in goods so as to make the transferee subject to risk of loss, etc. and the transfer of a legal instrument of title.

In *Henry* v. *General Forming, Ltd.* (1948) 33 Cal.2d 223 [200 P.2d 785], the court upheld the third party claim of the beneficial interest of a resulting trust of an automobile against the levy of an attaching creditor of the legal owner who held the title as trustee. The opinion states: ''The requirements for registration of title and ownership, as indicated by the code provisions, were enacted in the interest of the public welfare to protect innocent purchasers and afford identification of vehicles and persons responsible in cases of accident and injury. [Citation.]'' (33 Cal.2d at p. 227) The court held that the failure to register would not affect the true owner's rights. (See also *Morris Plan Co.* v. *Pacific Finance Corp.* (1966) 240 Cal.App.2d 844, 850 [50 Cal.Rptr. 136]; *LeGrand* v. *Russell* (1942) 52 Cal.App.2d 279, 280 [126

P.2d 136] ; *Carpenter* v. *Devitt* (1942) 49 Cal.App.2d 473, 475 [122 P.2d 79].)

In *Dorsey* v. *Barba* (1952) 38 Cal.2d 350 [240 P.2d 604] (overruled on other grounds in *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828 [59 Cal.Rptr. 276, 427 P.2d 988]), the court applied the foregoing principle to impose liability against a transferor who had failed to comply with the statutory requirements, and who remained of record as the registered owner at the time of the accident in which the transferee was found negligent.

In *Stoddart* v. *Peirce* (1959) 53 Cal.2d 105 [346 P.2d 774], the purchaser had defaulted, and the court was faced with the questions of whether the selling automobile dealer, and its customer who had turned in the car, could be held liable as "owners" for the negligence of the purchaser as a "permissive user." (See Veh. Code, former § 402, subd. (a), now § 17150.) It was contended that the dealer and former owner were liable because of failure to strictly comply with the statutory procedures for effecting transfer of legal title and registration. The court held that since there had been compliance before the accident, the mere delay by the dealer, and the failure of the former owner to insert a date did not negate the transfer so as to leave either of them liable. In the course of the opinion the court noted : "There is no doubt that the word 'owner' as used in section 402 for the purpose of creating a liability thereunder, is not synonymous with that word as used in the ordinary sense of referring to a person or persons whose title is good as against all others. Under the Vehicle Code there may be several such 'owners' at any one time. One or more persons may be an 'owner,' and thus liable for the injuries of a third party, even though no such 'owner' possesses all of the normal incidents of ownership (*Dorsey* v. *Barba*, 38 Cal.2d 350, 353 [240 P.2d 604])." (53 Cal.2d at p. 115. See also *Uber* v. *Ohio Cas. Ins. Co.* (1967) 247 Cal.App. 2d 611, 615 [55 Cal.Rptr. 720] ; *Meritplan Ins. Co.* v. *Universal Underwriters Ins. Co.* (1966) 247 Cal.App.2d 451, 456 [55 Cal.Rptr. 561] ; *Canadian Indem. Co.* v. *Motors Ins. Corp.* (1964) 224 Cal.App.2d 8, 13-14 [36 Cal.Rptr. 159] ; *Everly* v. *Creech, supra,* 139 Cal.App.2d 651, 657; *Logan* v. *Serpa* (1949) 91 Cal.App.2d 818, 821-822 [206 P.2d 70] ; and *Mc-Calla* v. *Grosse* (1941) 42 Cal.App.2d 546, 549 [109 P.2d 358]. *Cf. Coleman* v. *Fitzgerald* (1967) 252 Cal.App.2d 58, 62 [60 Cal.Rptr. 173] ; *Universal Underwriters Ins. Co.* v. *Aetna*

*Ins. Co.* (1967) 249 Cal.App.2d 144, 148 [57 Cal.Rptr. 240].)

The conclusion from the foregoing evidence that Mrs. Dearing did not acquire "ownership" of the automobile despite delivery and payment of the purchase price offends public policy. Mrs. Dearing should not be allowed to exercise dominion and control over the automobile without the responsibilities of ownership. (See *Everly* v. *Creech, supra,* 139 Cal.App. 2d 651, 657-658.) It is true that in this case she may be held liable as the signator on her son's license. The findings show that on the day of the accident Mrs. Dearing entrusted the car, not to Gary whose license was suspended, but to a friend of his, who permitted Gary to take over the operation of the vehicle prior to the accident. If the friend had caused the accident, Mrs. Dearing should not be allowed to escape liability as an owner granting permission to another to use her vehicle, because her transferor was holding up the registration.

"The transferee of an automobile under a sale accompanied by delivery of possession is deemed to be an owner thereof as to a third party injured by its use, for the purpose of imposing liability under Vehicle Code section 17150, even though there is no compliance with the prerequisites to transfer of title prescribed by Vehicle Code, section 5600; and the transferor is deemed to continue to be an owner as to such third party, for this purpose, unless he complies with the prerequisites to avoidance of liability as prescribed by Vehicle Code, section 5602. [Citations.] For this purpose there may be several 'owners.' [Citation.] The transferee or transferor of such an automobile who is an 'owner' thereof as that term is used in Vehicle Code, section 17150, also is an owner thereof as that term is used in a liability insurance policy issued to and covering an automobile owned by him; and is insured thereunder against loss arising out of its use by another with his permission. [Citations.] In California, an omnibus clause in such a policy extends the insurance coverage thereunder to the person who operates such an automobile with permission of the named insured, i.e., the 'owner.' [Citations.]" (*Uber* v. *Ohio Cas. Ins. Co., supra,* 247 Cal.App.2d 611, 615.)

A transfer of registration is not necessary to give rise to the automatic coverage under a clause giving coverage for a replacement automobile (*Dean* v. *Niagara Ins. Co., supra,* 24 Cal.App.2d Supp. 762, 766), or for an additional acquired vehicle (*Civil Service Emp. Ins. Co.* v. *Wilson* (1963) 222 Cal.App.2d 519, 524-525 [35 Cal.Rptr. 304]).

█ It is concluded that on the payment of the purchase price Mrs. Dearing became an owner for the purposes of the public liability provisions of the Vehicle Code of this state, and that her indemnification as such owner of an additionally acquired automobile was included within the provisions of the Bureau's policy.

The foregoing makes it unnecessary to pursue the reconciliation of the conflicting findings as to the agency of Rosen, and to determine whether he had authority to unconditionally sell the car. It also assumes that the conditions allegedly imposed by Hadden were communicated to Mrs. Dearing, and renders it unnecessary to resolve the dispute as to with whom he conversed.

*Coverage as a Non-Owned Vehicle*

The conclusion that the automobile was "owned" at the time of the accident makes further consideration of the contentions of Mrs. Dearing and her son superfluous. It may be noted, however, that the definition " 'non-owned automobile' means an automobile . . . not owned by or furnished for the regular use of either the named insured or any relative" does not rationally break down into (1) "an automobile not owned by either the named insured or any relative," and (2) "an automobile . . . furnished for the regular use of either the named insured or any relative."

The clause indicates a clear intent to exclude a non-owned automobile which is furnished for regular use. "An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected. [Citations.]" (*Continental Cas. Co.* v. *Phoenix Constr. Co.*, *supra*, 46 Cal.2d 423, 432.)

If there were no ownership in Mrs. Dearing a more serious question is presented by the conclusion that the automobile "was regularly furnished for the use of Gary. . . ." The evidence supports the findings that he used the car regularly, but there is some dispute as to whether the owner directly, or through Rosen as agent, authorized such use.

The judgment, and an order denying the Dearings' motion to vacate the judgment, from which they have also appealed, are reversed, and the case is remanded with instructions to the trial court to modify the findings of fact, conclusions of law, and the judgment in accordance with the views expressed in this opinion.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied March 20, 1968, and respondent's petition for a hearing by the Supreme Court was denied April 24, 1968.